No. 24,823.

THE STATE OF KANSAS, ex rel., WILLIAM H. BURNETT, County Attorney of Reno County, *Appellant*, v. THE J. ROSENBAUM GRAIN COMPANY and THE POSTAL TELEGRAPH & CABLE COMPANY, *Appellees*.

SYLLABUS BY THE COURT.

INJUNCTION—*To Enjoin the Maintenance and Operation of a Commission House Contrary to the Bucket-shop Law—Jurisdiction and Federal Regulation is Exclusive*. The action was one to enjoin the grain company from maintaining and operating a commission house in Hutchinson, contrary to the bucket-shop law, and to enjoin the telegraph company from furnishing telegraphic facilities for such maintenance and operation. The district court returned findings of fact showing the transactions of the company were transactions affecting interstate commerce regulated by the grain futures act of congress. *Held*, the federal regulation is exclusive, and the injunction was properly denied.

Appeal from Reno district court; WILLIAM G. FAIRCHILD, judge. Opinion filed January 12, 1924. Affirmed.

*Charles B. Griffith*, attorney-general, *John F. Rhodes*, assistant attorney-general, *H. F. Brown*, county attorney, *F. Dumont Smith, William H. Burnett*, and *J. R. Beeching*, all of Hutchinson, for the appellant.

*A. L. Berger*, of Kansas City, *F. L. Martin, John M. Martin, James N. Farley, Carr W. Taylor, John H. Connaughton*, all of Hutchinson, *Henry S. Robbins, M. M. Townley*, both of Chicago, Ill., and *H. H. Berger*, of Kansas City, Mo., for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one to enjoin the grain company from maintaining and operating a commission house in Hutchinson, and to enjoin the telegraph company, which leases a wire to the grain company, from furnishing telegraphic facilities for such maintenance and operation. An injunction was denied, and the state appeals.

The action was predicated on the Statutes of 1899 and 1909, relating to dealing in futures and to bucket shops. (R. S. 50-121, and following sections.) The court returned the following findings of fact:

"*First*. That the defendant, The J. Rosenbaum Grain Company, is engaged in the grain business with offices at Hutchinson, Kansas, Kansas City, Missouri, and Chicago, Illinois, and other places, which offices are connected by a private wire leased from the defendant, The Postal Telegraph-Cable

The State, *ex rel.,* v. Rosenbaum Grain Co.

Company, which wire is used in sending and receiving prices, market quotations, orders to buy or sell, confirmation of trades, and other business generally between their offices.

"*Second.* That during the past two years and up to and including the present time, the defendants, The J. Rosenbaum Grain Company, was engaged, among other things, in the business of buying and selling grain on commission for various and numerous customers for future delivery.

"*Third.* That this business of their customers in the buying and selling of grain was all in accordance with the rules and regulations of the Chicago and Kansas City boards of trade.

"*Fourth.* That all of the business of all of its customers in the buying and selling of grain was handled in substantially the same manner, the proceedings in each instance being the same. The customer would give the agent and representative of the defendant at the Hutchinson office an order to buy or sell, as the case might be, any particular kind of grain, with time and place of delivery and other details. This order would be accepted at the Hutchinson office and wired to the Chicago or Kansas City office for execution in accordance with the request of the customer. If the order was to Chicago, it would be received by the main office, phoned or messaged to the defendant's floor broker on the board of trade, by him executed, its execution phoned or messaged back to the office, record made of same, and the execution of the trade wired to the Hutchinson office, and the customer notified, and two days afterwards or such a matter, in the regular course of mail, confirmation of the trade would be received by the customer direct from the Chicago office.

"*Fifth.* That all of these orders for customers were *bona fide,* executed and filled on the board of trade with third parties, and provided, among other things, for delivery at a specified time, which could be enforced.

"*Sixth.* That these transactions for customers were usually conducted on a margin, although where a customer had credit, a margin in the first instance was not always required.

"*Seventh.* That the defendant's customers were generally persons or corporations engaged in some capacity in the grain business. That some of the trades were in the nature of hedging against wheat actually held by the customer in his line of elevators, or against shipments, and in other instances the transactions were for gain only.

"*Eighth.* That none of these transactions, or at least substantially much the greater part thereof, were never completed by delivery, but would be settled or cleaned up by the customers giving an order to defendant to close the trade by buying or selling, as the case might require, which order went through the same course and was executed by defendant by regular purchase or sale upon the board of trade, and the original transaction would then be closed out or settled in accordance with the board of trade rules made for such purposes.

"*Ninth.* That probably in no case was an order given by a customer to either buy or sell with the intention or expectation on his part of actual delivery of grain, but his intention usually at all times was to close out by purchase or sale, as the case might be, his order in accordance with the rules and regulations of the board of trade.

"*Tenth.* That the closing out of a trade was always through· the defendant making the same, and that all of the transactions, both the original order; and the closing out of same, were executed by sales or purchases, as the case, might be, on the board of trade, whether in Chicago or Kansas City."

The defendants say the questions involved are, first, whether the' statutes apply to the transactions disclosed, and second, whether in any event the statutes may be applied, in view of the grain futures act of congress (42 U. S. Stat., ch. 369, p. 998). The questions are stated in inverse order. If the activities of the defendants were in the field of interstate commerce covered by the federal act, as the defendants pleaded, the federal regulation is conclusive, whatever. the Kansas statute may mean.

No business has ever received more thorough investigation and more pitiless publicity than the grain trade. Very recently the last· detail of its conduct, uses, and abuses, has been laid bare and appraised in the report of the federal trade commission on "The Grain Trade," volume 5 of which is devoted to "Future Trading Operations in Grain," and in the congressional committee hearings and reports on the future trading and grain futures acts. The subject is too large for even summarization here. The pedigree of the grain futures act as offspring of constitutional law is pertinent, and may be outlined.

In *Ware & Leland v. Mobile County,* 209 U. S. 405, decided in 1908, the court upheld a statute of the state of Louisiana imposing a tax on brokers and persons trading in cotton and wheat futures. The transactions considered were conducted in all respects as the transactions involved in the present case. When an order to buy or sell was given nothing would be said about delivery, the order would be executed by a transaction upon some exchange—in the case of wheat, the Chicago board of trade—whose rules provided for actual delivery, but permitted set-off and ringing, and in all except a few instances contracts of purchase were covered by contracts of sale, and vice versa. The court held the speculative transactions did not constitute subjects of interstate commerce, when there was actual delivery there was no movement in interstate commerce, and consequently the taxing statute was not a regulation of interstate commerce.

In the case of *United States v. Patten,* 226 U. S. 525, decided in 1913, the court sustained an indictment under the Sherman act charging a conspiracy to run a corner in cotton. It was held the

necessary effect of the corner was directly to impede and burden the due course of trade and commerce among the states. Referring to the Ware & Leland case, the court said:

"The defendants place some reliance upon *Ware & Leland v. Mobile County,* 209 U. S. 405, as showing that the operation of the conspiracy did not involve interstate trade or commerce, but we think the case does not go so far and is not in point. It presented only the question of the effect upon interstate trade or commerce of the taxing by a state of the business of a broker who was dealing in contracts for the future delivery of cotton, where there was no obligation to ship from one state to another; while here we are concerned with a conspiracy which was to reach and bring within its dominating influence the entire cotton trade of the country and which was to be executed, in part only, through contracts for future delivery." (*United States v. Patten,* 226 U. S. 525, 543.)

In the case of *Hammer v. Dagenhart,* 247 U. S. 251, decided in 1918, the court held invalid the first child labor law prohibiting transportation in interstate commerce of goods produced in factories where child labor was employed.

In the case of *United States v. Ferger,* 250 U. S. 199, decided in 1918, the court upheld the statute punishing forgery of bills of lading. It was argued the act could not constitutionally apply to forgery of a bill of lading when no shipment from one state to another was made or intended, and could not apply to wholly fictitious bills of lading which related to no commerce at all. The court held otherwise, on the ground congress has power to deal with acts not in themselves interstate commerce, but which injuriously obstruct or affect such commerce, and congress may punish the fraudulent making of spurious bills as a means of protecting and sustaining the vast volume of interstate commerce which moves in reliance on genuine bills.

With the law in this condition, the framers of the future trading act went back to *Ware & Leland v. Mobile County* as authority against use of the power over interstate commerce, and based the statute on the taxing power of congress (42 U. S. Stat. 187; August 24, 1921). The same power had been relied on in the enactment of the second child labor law (40 U. S. Stat. 1057, at 1138; February 24, 1919). The two acts fell together on May 15, 1922. (*Child Labor Tax Case,* 259 U. S. 20; *Hill v. Wallace,* 259 U. S. 44.)

On May 1, 1922, the packers and stockyards act of 1921 was upheld. (*Stafford v. Wallace,* 258 U. S. 495.) In the statement of the case the chief justice referred to the federal trade commission and

congressional committee investigations of the meat packing indus-
try, and in the opinion said:

"We have framed the statement of the case, not for the purpose of deciding
the issues of fact mooted between the packers and their accusers before the
federal trade commission or the committees on agriculture in congress, but
only to enable us to consider and discuss the act whose validity is here in
question in the light of the environment in which congress passed it. It was
for congress to decide, from its general information and from such special
evidence as was brought before it, the nature of the evils actually present or
threatening, and to take such steps by legislation within its power as it
deemed proper to remedy them. It is helpful for us in interpreting the effect
and scope of the act in order to determine its validity to know the conditions
under which congress acted." (p. 512.)

In concluding the opinion it was said:

"As already noted, the word 'commerce' when used in the act is defined to
be interstate and foreign commerce. Its provisions are carefully drawn to
apply only to those practices and obstructions which in the judgment of con-
gress are likely to affect interstate commerce prejudicially. Thus construed
and applied, we think the act clearly within congressional power and valid."
(p. 528.)

In *Hill v. Wallace* it was contended the future trading act might
be saved under the commerce clause of the constitution, but the
court said:

"There is not a word in the act from which it can be gathered that it is
confined in its operation to interstate commerce. The words 'interstate com-
merce' are not to be found in any part of the act from the title to the closing
section. The transactions upon which the tax is to be imposed, the bill avers,
are sales made between members of the board of trade in the city of Chicago
for future delivery of grain, which will be settled by the process of offsetting
purchases or by a delivery of warehouse receipts of grain stored in Chicago.
Looked at in this aspect and without any limitation of the application of the
tax to interstate commerce, or to that which the congress may deem from evi-
dence before it to be an obstruction to interstate commerce, we do not find
it possible to sustain the validity of the regulations as they are set forth in
this act. A reading of the act makes it quite clear that congress sought to
use the taxing power to give validity to the act. It did not have the exercise
of its power under the commerce clause in mind and so did not introduce into
the act the limitations which certainly would accompany and mark an exer-
cise of the power under the latter clause.

.   .   .   .   .   .   .   .   .   .   .   .   .

"It follows that sales for future delivery on the board of trade are not in
and of themselves interstate commerce. They can not come within the regu-
latory power of congress as such, unless they are regarded by congress, from
the evidence before it, as directly interfering with interstate commerce so as
to be an obstruction or a burden thereon. *United States v. Ferger*, 250 U. S.

199. It was upon this principle that in *Stafford v. Wallace,* 258 U. S. 495, we held it to be within the power of congress to regulate business in the stockyards of the country, and include therein the regulation of commission men and of traders there, although they had to do only with sales completed and ended within the yards, because congress had concluded that through exorbitant charges, dishonest practices and collusion they were likely, unless regulated, to impose a direct burden on the interstate commerce passing through." (*Hill v. Wallace,* 259 U. S. 44, 68, 69.)

As noted above, *Hill v. Wallace* was decided on May 15, 1922, and in September, 1922, congress passed the grain futures act, which was appropriately limited to interstate commerce, and which contained the following finding of fact:

"Sec. 3. Transactions in grain involving the sale thereof for future delivery as commonly conducted on boards of trade and known as 'futures' are affected with a national public interest; that such transactions are carried on in large volume by the public generally and by persons engaged in the business of buying and selling grain and the products and by-products thereof in interstate commerce; that the prices involved in such transactions are generally quoted and disseminated throughout the United States and in foreign countries as a basis for determining the prices to the producer and the consumer of grain and the products and by-products thereof and to facilitate the movements thereof in interstate commerce; that such transactions are utilized by shippers, dealers, millers, and others engaged in handling grain and the products and by-products thereof in interstate commerce as a means of hedging themselves against possible loss through fluctuations in price; that the transactions and prices of grain on such boards of trade are susceptible to speculation, manipulation, and control, and sudden or unreasonable fluctuations in the prices thereof frequently occur as a result of such speculation, manipulation, or control, which are detrimental to the producer or the consumer and the persons handling grain and products and by-products thereof in interstate commerce, and that such fluctuations in prices are an obstruction to and a burden upon interstate commerce in grain and the products and by-products thereof and render regulation imperative for the protection of such commerce and the national public interest therein." (42 U. S. Stat. 999.)

Section 4 of the act forbids all persons to use the mails, or interstate telephone, telegraph, wireless, or other communication, in offering or accepting sales of grain for future delivery, on or subject to the rules of any board of trade, with certain exceptions. One exception is when contracts are made by or through members of boards of trade located at markets which have a sufficient volume of cash sales to reflect the general value of grain, and which have been designated by the secretary of agriculture as contract markets. In order that boards of trade may have the benefit of designation as contract markets, they must comply with certain condi-

tions, one of which is prevention of manipulation of prices by dealers or operators on the board. Contract markets are placed under supervision of the secretary of agriculture. Any person violating the provisions of the act or the regulations made pursuant to it, may be excluded from trading privileges, and any one trading in futures in violation of section 4 is declared to be guilty of a misdemeanor. The statute was upheld in the case of *Chicago Board of Trade v. Olsen,* 262 U. S. 1, decided April 16, 1923.

The statute was leveled particularly at the Chicago board of trade, which is the greatest grain market in the world. In 1922, its cash sales of grain amounted to 350 million bushels. Cash sales consist of grain sold on the exchange, sales to arrive, and that very small percentage of grain which is actually delivered on contracts for future delivery. Concerning this flow of grain through Chicago the court said:

"It is impossible to distinguish the case at bar, so far as it concerns the cash grain, the sales to arrive, and the grain actually delivered in fulfillment of future contracts, from the current of stock shipments declared to be interstate commerce in *Stafford v. Wallace,* 258 U. S. 495.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"The sales on the Chicago board of trade are just as indispensable to the continuity of the flow of wheat from the West to the mills and distributing points of the East and Europe, as are the Chicago sales of cattle to the flow of stock toward the feeding places and slaughter and packing houses of the East." (pp. 34, 36.)

Turning to the subject of future sales, the court said:

"The question under this act is somewhat different in form and detail from that in the Stafford case, but the result must be the same. It is not the sales and deliveries of the actual grain which are the chief subject of the supervision of federal agency by congress in the grain futures act, although a record of cash sales is required, and a corner in cash sales would be a violation of it, and there are other provisions equally regulatory of them. It is the contracts of sales of grain for future delivery, most of which do not result in actual delivery but are settled by offsetting them with other contracts of the same kind, or by what is called 'ringing.' *Chicago Board of Trade v. Christie Grain & Stock Co.,* 198 U. S. 236, 246-247, 25 Sup. Ct. 637, 49 L. Ed. 1031. The question is whether the conduct of such sales is subject to constantly recurring abuses which are a burden and obstruction to interstate commerce in grain? And further, are they such an incident of that commerce and so intermingled with it that the burden and obstruction caused therein by them can be said to be direct?

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"It is clear from the citations, in the statement of the case, of evidence before committees of investigation as to manipulations of the futures market

The State, *ex rel.*, v. Rosenbaum Grain Co.

and their effect, that we would be unwarranted in rejecting the finding of congress as unreasonable, and that in our inquiry as to the validity of this legislation we must accept the view that such manipulation does work to the detriment of producers, consumers, shippers and legitimate dealers in interstate commerce in grain and that it is a real abuse.

*     ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"It is said there is no relation between prices on the futures market and in the cash sales. This is hardly consistent with the affidavits the plaintiffs present from the leading economists, already referred to, who say that dealing in futures stabilizes cash prices.

*     ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

.   "Prices of grain futures are those upon which an owner and intending seller of cash grain is influenced to sell or not to sell as they offer a good opportunity to him to hedge comfortably against future fluctuations. Manipulations of grain futures for speculative profit, though not carried to the extent of a corner or complete monopoly, exert a vicious influence and produce abnormal and disturbing temporary fluctuations of prices that are not responsive to actual supply and demand and discourage, not only this justifiable hedging, but disturb the normal flow of actual consignments. A futures market lends itself to such manipulation much more readily than a cash market.

*     ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"The question of price dominates trade between the states. Sales of an article which affect the country-wide price of the article directly affect the country-wide commerce in it. By reason and authority, therefore, in determining the validity of this act, we are prevented from questioning the conclusion of congress that manipulation of the market for futures on the Chicago board of trade may, and from time to time does, directly burden and obstruct commerce between the states in grain, and that it recurs and is a constantly possible danger. For this reason, congress has the power to provide the appropriate means adopted in this act by which this abuse may be restrained and avoided." (pp. 36-40.)

From the foregoing, he who runs may read that congress constitutionally assumed authority over trading in grain futures because of the relation to and effect upon interstate commerce of that business. Before the grain company may be enjoined from doing business in this state, two conditions must appear from the findings of fact: first, that the grain company has been denied the privilege of trading on contract markets, or is operating wholly outside the field of such privilege; and second, that it is maintaining a nuisance under the state law. Since the first condition does not exist, the inquiry is ended, because the grain company does not have two masters over its handling of grain futures. Citation of authority would be superfluous.

The state bases its right to an injunction on the ninth finding, that probably in no case was an order given by a customer to the grain company to buy or sell with the intention or expectation on the part of the customer of actual delivery of grain. The argument is that because of this mental attitude the transactions were gambling, the grain company knew, or must have had notice of, the wagering character of the transactions, and so was accessory to them, and going through the form of executing contracts on the board of trade was mere pretense.

There was evidence to sustain the findings, including the fifth and the concluding portion of the ninth. Leaving at one side the subjects of *bona fides* and enforceability mentioned in the fifth finding, and the intention of customers mentioned in the ninth finding, the findings and the evidence on which they are based are conclusive that all transactions were conducted from beginning to end as genuine transactions for legitimate purposes, according to contract market rules. They were transactions affecting interstate commerce regulated by the grain futures act, and it is not for the courts or the legislature of this state to approve or disapprove contract market rules and practices which are subject to federal supervision.

There are men who study all the conditions affecting the marketing of grain, and make it their business to seek profit from exercise of their judgment respecting the future price of grain. They are called speculators, and their operations help to make and stabilize the market price of grain to the farmer, the elevator man, the miller, and all others interested in that price. The grain futures act does not prohibit speculation. It recognizes speculation as lawful, and one of the patent purposes of the act was to protect, as an insurance expedient, that form of speculation known as hedging.

Speculation is not confined to large operators on boards of trade. The general public speculates, and the act does not prohibit the general public from speculating. The dealings of innumerable suckers bear relation to the market price of grain, which is the burden of the act. The act affords them a measure of protection by undertaking to prevent manipulation of the market by large operators, but it was apparently framed in accordance with the views expressed by Mr. Justice Holmes, in the opinion in the case of *Board of Trade v. Christie Grain & Stock Co.*, 198 U. S. 236:

"As has appeared, the plaintiff's [Chicago Board of Trade's] chamber of commerce is, in the first place, a great market, where, through its eighteen

hundred members, is transacted a large part of the grain and' provision business of the world. Of course, in a modern market contracts are not confined to sales for immediate delivery. People will endeavor to forecast the future and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value is well-known as a means of avoiding or mitigating catastrophes, equalizing prices and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand,, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain." (p. 247.)

Congress knew all about the manner in which trading in futures· is conducted. The volume is enormously greater than the supply of grain deliverable in satisfaction of contracts, and delivery is effected by offset and ringing:

"A set-off is in legal effect a delivery . . . which is no more wonderful than the enormous disproportion between the currency of the country and contracts for the payment of money, many of which in like manner are set off in clearing houses without any one dreaming that they are not paid, and for the rest of which the same money suffices in succession, the less being needed the more rapid the circulation is." (*Board of Trade v. Christie Grain & Stock Co.,* supra, p. 250.)

The availability, under board of trade rules, of set-off by purchasing against a sale and selling against a purchase, has become so familiar that, for many persons, actual delivery fades into a legal theory, or vanishes altogether, instead of being a fact actively influencing their minds when dealing. When a miller hedges on the wheat in his mill, or on wheat purchased and under contract of delivery to him, by selling short, he distinctly does not intend to deliver that wheat, because he intends to grind it into flour; and getting down to the naked truth, he does not contemplate buying and delivering any other wheat on his contract of sale. He may know that delivery would be involved if he allowed his short sale to mature, but allowing it to mature does not occur to him. He fully intends from the beginning, to buy against his hedging contract when the need for insurance is passed. Considered merely in the aspect of relation to interstate commerce, there is no difference between transactions of the miller and transactions of the man who only

4—115 KAN.

understands that if he sells short he can buy against the deal, taking the profit or paying the loss.

The grain futures act gives much attention to keeping records of board of trade transactions. By proviso annexed to the exception in section four, lawful trading at a contract market involves evidencing every contract by writing, showing date, parties and addresses, property covered, price, and terms of delivery. Each board member shall keep such record for a period of three years, or longer if the secretary of agriculture shall so direct, which record shall at all times be open to inspection of the departments of agriculture and justice. By section five, one of the conditions to obtaining designation as a contract market is that the board of trade must make provision for keeping a record showing all the details of all cash and future grain transactions, and for making reports thereof to the secretary of agriculture. From these records and reports the secretary of agriculture derives information on which, if necessary, he may base disciplinary action.

Every order given to a broker to buy or sell is an offer to make a contract, within the statute. When the broker executes an order he does make what for all purposes of the statute is a contract. Whether or not a customer had in mind delivery in fact, and even although he intended to gamble, the contract goes upon record, for all purposes of the act, as one for delivery of grain and, as a matter of law, the customer's undisclosed intention will not defeat it. (*Browne v. Thorn*, 260 U. S. 137.)

Suppose the broker has reason to believe, when an order is received, that his customer intends to provide an offset for his trade by subsequent purchase or sale. If the broker does not bucket the order—that is, take the other side of the trade without executing the order in a contract market—and if the broker has no understanding or agreement with the customer that they will depart from the contract market rules, but the broker does proceed to effectuate a recorded contract according to the rules of the market on which he trades, he does precisely the things which congress has brought within the scope of its regulation.

The result of the foregoing is, the business the grain company is doing lies within the field of federal regulation annexed by the grain futures act; until the grain company is deprived by competent authority of contract market privileges, it may not be enjoined from conducting its business in this state; and the telegraph company may

not be enjoined from furnishing interstate telegraphic facilities necessary to the conduct of the grain company's business.

The judgment of the district court is affirmed.