## UHLMANN GRAIN CO. v. DICKSON et al.
### No. 9119.

Circuit Court of Appeals, Eighth Circuit.
Feb. 18, 1932.

Rehearing Denied March 21, 1932.

KENYON, Circuit Judge, dissenting.

Alfred M. Seddon, of Kansas City, Mo. (I. P. Ryland, Arthur Mag, Roy B. Thomson, Paul R. Stinson, and Ryland, Stinson, Mag & Thomson, all of Kansas City, Mo., on the brief), for appellant.

S. J. Jones, of Carrollton, Mo. (R. S. Righter, of Kansas City, Mo., G. C. Jones, of Carrollton, Mo., and Lathrop, Crane, Reynolds, Sawyer & Mersereau, of Kansas City, Mo. on the brief), for appellees.

Before KENYON, VAN VALKENBURGH, and GARDNER, Circuit Judges.

GARDNER, Circuit Judge.

Appellant, a grain broker and an Illinois corporation, brought these five actions at law against appellees to recover moneys advanced by appellant to the appellees and earned broker's commission on the purchase and sale of grain for future delivery. By stipulation of the parties, the five actions were consolidated and tried as one, trial by jury being waived. The trial of the consolidated cases resulted in a judgment against appellant and in favor of the appellees.

The parties will be referred to as they appeared in the lower court.

The petition of plaintiff in each of the cases was in conventional form, alleging that at all times therein mentioned plaintiff was engaged in the grain business, acting as a grain broker. That, on the various dates referred to, the defendants employed plaintiff to purchase and sell wheat and other grains for them on certain named markets, the de-

fendants agreeing to pay plaintiff a commission on all such purchases and sales; that pursuant to such employment plaintiff purchased and sold grain for defendants, plaintiff sometimes advancing all or a part of the purchase price of such grain, for which services and advancements defendants agreed to pay plaintiff, and that during said time an account arose between plaintiff and the defendants of mutual credits and debits in the purchase and sale of grain, the account being attached and made a part of the petition in each case.

The defendants filed answer in each case, denying generally that they were indebted to plaintiff on account of the allegations in the petition, or any item thereof, and affirmatively alleging that each and all of the transactions involved were fictitious. That the buying and selling of the grain, as alleged by plaintiff, was a mere form and pretense; that the various transactions in question were gambling transactions between plaintiff and defendants, were illegal, and in violation of the laws of the state of Missouri. That the defendants at the time of the transactions did not intend to accept delivery when they purchased grain, or make delivery when they sold it, and that their gains and losses were to be ascertained by the fluctuations in the market prices of the grain; that is to say, by taking the difference between the price at which it was pretended to be purchased, and the price at which it was sold, such difference to determine the amount of their gain, or the amount of their loss.

The reply of plaintiff put in issue the affirmative allegations of the answer.

The evidence discloses that plaintiff was engaged in the grain, grain elevator, and grain brokerage business, and was a member in good standing of the grain exchanges or boards of trade of Kansas City, Mo., Chicago, Ill., Minneapolis, Minn., and Winnipeg, Canada. Its business consisted in buying and selling cash grain for itself and for its customers, the operation of grain elevators, and acting as agent or broker for its customers in the purchase and sale of grain for future delivery. In the year 1924, when all the transactions here in question were had, plaintiff maintained a principal office at Chicago, Ill., and a branch office at Kansas City, Mo. It also maintained a local office at Carrollton, Mo., which was in charge of one E. S. McDonough.

The transactions here involved were initiated in the local office of plaintiff at Carrollton, by the giving of an order by one of the defendants to plaintiff's agent or employee, for the purchase or sale of grain for future delivery, to be executed on the boards of trade or grain exchanges at Kansas City, Chicago, Minneapolis, or Winnipeg. Plaintiff maintained a private leased telegraph wire from its Carrollton office to its Kansas City office. Verbal orders of purchase or sale were given by defendants to plaintiff's agent at Carrollton, which were by him transmitted by telegraph to plaintiff's Kansas City office for acceptance or rejection. Plaintiff's agent at Carrollton had no authority to accept or reject any order for the purchase or sale of grain for future delivery, but transmitted such order to plaintiff's Kansas City office for acceptance or rejection. If the order was accepted by plaintiff, its Kansas City office immediately telegraphed an order for execution to its Chicago office, except where the order was for the purchase or sale of Kansas City wheat. If the order was for the purchase or sale of Chicago wheat, it was executed on the trading floor of the Chicago board of trade; if for the purchase or sale of Minneapolis or Winnipeg wheat, it was executed on the trading floor of that respective board of trade or grain exchange. Immediately upon the execution of such an order, plaintiff made out and mailed from its Kansas City office to the customer a written confirmation of the order and of its execution. Such written confirmation recited the date of the contract, the quantity and kind of grain bought or sold, the contract price (per bushel) of the commodity, the delivery month, and the place where the contract of purchase or sale was executed, as required by the Federal Grain Futures Act (7 USCA §§ 1–17). Such written confirmation recited that: "All transactions made by us for your account contemplate the actual receipt and delivery of the property and payment therefor. We reserve the right to close these transactions when deposits are running out, without giving further notice. We also reserve the privilege of clearing all transactions through Clearing Associations, if there be any, from day to day in accordance with the usage, rules or regulations of the Exchange where the trade is made, prevailing at the time. All purchases and sales made by us for you are made in accordance with and subject to the rules, regulations and customs of the Chamber of Commerce or Board of Trade where the trades are made, and the rules, regulations and requirements of its Board of Directors, and all amendments that

may be made thereto. This contract is made under authority of the Act of Congress known as 'The Future Trading Act.' "

Each contract of purchase or sale of grain for future delivery, here involved, was made and executed on the respective boards of trade or exchange in the name of the plaintiff as a clearing member of such board of trade or exchange, and was made with a grain broker who was also a clearing member of such board of trade or exchange, in the name of said broker acting either for himself or for an undisclosed principal; in fact, the rules of the respective exchanges, and also section 4 (b) of the Federal Grain Futures Act, 7 USCA, § 6 (b) require that all contracts for the purchase and sale of grain for future delivery shall be made by or through a clearing member of the board of trade or exchange which has been designated as a "contract market." Clearing members are the parties to these transactions on the exchange, and they look for settlements to one another. Plaintiff was a member in good standing of the federal department. The Chicago Board of Trade, the Minneapolis Board of Trade, and the Kansas City Board of Trade, were all officially designated as "contract markets" by the Secretary of Agriculture, in accordance with the provisions of the Federal Grain Futures Act. Every contract of purchase or sale executed by plaintiff for defendants obligated it to full performance by sale or purchase, and such performance was protected by the margin or deposit maintained by it with the clearing house, or exchange, or board on which the transaction was made.

On most of the transactions here involved, defendants put up a margin or deposit with plaintiff. Plaintiff's only remuneration or compensation was for acting as broker for defendants in these transactions. Every sale or purchase made by plaintiff for defendants had an offsetting purchase or sale, so that the net result was that no grain was delivered in any of these transactions. The testimony of the defendants was that they did not intend to make delivery in any case of the grain sold, or to accept delivery of any grain purchased, but that each sale or purchase was intended to be fulfilled by an offsetting sale or purchase of grain before the expiration of the time required for delivery.

The lower court found that all the purchases or sales were offset by sales or purchases executed in the same manner as the initiating purported purchase or sale, and that "every pretended purchase or sale was closed out by a purported offsetting transaction before the delivery time arrived and was purported to have been executed by plaintiff on the orders and at the instruction of defendants, save and except as to some of the last transactions, which were closed out by plaintiff without instruction from such defendant at a time when defendant had no cash margin to protect his transactions." The court concluded that the transactions were gambling transactions and void under Revised Statutes of Missouri, 1929, §§ 4316 to 4326 inclusive.

On this appeal it is contended: (1) That there was no substantial evidence to support the finding of the court that the transactions were fictitious or gambling transactions; (2) that the Federal Grain Futures Act superseded all state laws relating to the subject of dealings in futures on contract markets, and that the contracts in question were valid under the Federal Grain Futures Act; (3) that, independently and apart from the federal statutes, plaintiff was entitled to recover; and (4) that, if the transactions as made were unlawful, it was because of the acts of plaintiff's agent at Carrollton, which were outside the scope of his authority.

There is little room for originality of thought or expression so far as the law covering this subject is concerned, because it has been well settled by controlling decisions of the Supreme Court of the United States and of this court. There was no evidence that plaintiff bet with its customers, as found by the lower court. If the defendants lost on transactions, the plaintiff did not thereby win, and, if they won by the transactions, the plaintiff did not thereby lose. There was no element of wager or bet in the transactions between plaintiff and defendants. The court, in its tenth finding, found that none of the contracts were actually executed between clearing members of the exchange, but the undisputed evidence shows that in every instance the plaintiff went into a contract market and bound itself to purchase or sell. These transactions were sufficiently real so that the defendants in some instances realized and accepted a profit therefrom. On some of them there was a loss, which to date plaintiff, in part at least, has suffered. The transactions were real enough so that in most instances defendants deposited with plaintiff, and plaintiff in turn deposited with the board of trade or exchange concerned, a margin to secure the performance of the contracts it made. So

far as plaintiff is concerned, it was bound by the contracts of purchase and sale which it entered into as the broker for the defendants, to receive or deliver the grain contracted for, and it was liable in damages for the failure so to do.

■ Speculation is not necessarily gambling, and, absent some constitutional or statutory provision to the contrary, a contract for the sale or purchase of a commodity to be delivered at a future day is very generally held to be valid, even though the seller has not the commodity and has no means of getting it, other than to go into the market and buy it before the day of delivery. The contracts here under consideration were presumed to be lawful, and, the defendants having pleaded that they were gambling contracts, the burden of proof was upon them to prove facts which voided them. Clews v. Jamieson, 182 U. S. 461, 21 S. Ct. 845, 45 L. Ed. 843; Cleage v. Laidley (C. C. A.) 149 F. 346; Browne v. Thorn (C. C. A.) 272 F. 950; Hoyt v. Wickham (C. C. A.) 25 F.(2d) 777.

■ Contracts for future delivery made with the intention of settling them by offset or by ringing off or ringing out and by the payment of differences, in accordance with the rules and practice of boards of trade, are not wagering contracts. It is not necessarily gambling that the buyer in a contract of sale providing for future delivery resells before the maturity of his contract; in fact, the contract is not tainted with the element of gambling by reason of the fact that at the time of the making of the contract a purchaser intends to resell before the time appointed for delivery. Chicago Board of Trade v. Christie Grain, etc., Co., 198 U. S. 236, 25 S. Ct. 637, 638, 49 L. Ed. 1031; Clews v. Jamieson, 182 U. S. 461, 21 S. Ct. 845, 45 L. Ed. 1183; Browne v. Thorn, 260 U. S. 137, 43 S. Ct. 36, 67 L. Ed. 171; Board of Trade of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839; Gettys v. Newburger (C. C. A.) 272 F. 209, 218; Browne v. Thorn (C. C. A.) 272 F. 950; Mullinix v. Hubbard (C. C. A.) 6 F.(2d) 109, 114; Wilhite v. Houston (C. C. A.) 200 F. 390; Hoyt v. Wickham (C. C. A.) 25 F.(2d) 777; Solomon v. Newburger (C. C. A.) 35 F.(2d) 328; Lyons Milling Co. v. Goffe & Carkener (C. C. A.) 46 F.(2d) 241, 247; Grain Futures Act, 7 USCA §§ 1 to 17.

The Grain Futures Act, approved September 21, 1922 (7 USCA §§ 1–17) was enacted for the stated purpose of preventing and removing obstructions and burdens from interstate commerce in grain by regulating transactions in grain future exchanges. It limited the right to deal in futures and placed the practice under certain restrictions and regulations. Section 4 of that act (section 6, title 7, USCA) makes it unlawful for any person to transmit, through the mail or otherwise in interstate commerce, any offer to make or execute, or any confirmation of the execution of, or any quotations, or report of the price of any contract of sale of grain for future delivery on or subject to the rules of any board of trade in the United States, or for any person to make or execute such contract of sale, "which is or may be used for (a) hedging any transaction in interstate commerce in grain or the products or by-products thereof, or (b) determining the price basis of any such transaction in interstate commerce, or (c) delivering grain sold, shipped, or received in interstate commerce for the fulfillment thereof, except—

"(a) Where the seller is at the time of the making of such contract the owner of the actual physical property covered thereby, or is the grower thereof, or in case either party to the contract is the owner or renter of land on which the same is to be grown, or is an association of such owners, or growers of grain, or of such owners or renters of land; or

"(b) *Where such contract is made by or through a member of a board of trade which has been designated by the Secretary of Agriculture as a 'contract market,' as hereinafter provided in this chapter, and if such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery.*" (Italics ours.)

■ While the act placed a ban upon much of the practice of dealing in futures that had theretofore existed, it is to be observed that the transactions here involved seem clearly to come within exception (b), and the evidence shows that the requirements of that section were all complied with. It was manifestly the intention of Congress to legitimatize and make lawful transactions, dealings, and contracts in grain futures in which the provisions of this act were complied with. Having made it unlawful for any person to engage in such transactions unless within the exceptions specified, it seems necessarily to follow that, where the transaction comes within the exceptions specified, and has met and complied with all the requirements provided in the statute, such transactions are valid.

Dealings in grain futures had been sustained by the courts before this act of Congress was passed. The act does not in terms at least provide that the validity of transactions in grain futures shall depend upon whether the purchaser or seller intends to take or to make actual delivery of the grain. Congress left the law in this regard as it stood at the time of the adoption of the act. In Board of Trade of Chicago v. Christie Grain, etc., Co., supra, in an opinion by Mr. Justice Holmes, it is said:

"We must suppose that then as now, a settlement would be made by the payment of differences, after the analogy of a clearing house. This naturally would take place no less that the contracts were made in good faith, for actual delivery, since the result of actual delivery would be to leave the parties just where they were before. Set-off has all the effects of delivery. The ring settlement is simply a more complex case of the same kind. * * *

"The fact that contracts are satisfied in this way by set-off and the payment of differences detracts in no degree from the good faith of the parties, and if the parties know when they make such contracts that they are very likely to have a chance to satisfy them in that way, and intend to make use of it, that fact is perfectly consistent with a serious business purpose, and an intent that the contract shall mean what it says. * * *

"In the view which we take, the proportion of the dealings in the pit which are settled in this way throws no light on the question of the proportion of serious dealings for legitimate business purposes to those which fairly can be classed as wagers, or pretended contracts. No more does the fact that the contracts thus disposed of call for many times the total receipts of grain in Chicago. The fact that they can be and are set off sufficiently explains the possibility, which is no more wonderful than the enormous disproportion between the currency of the country and contracts for the payment of money, many of which in like manner are set off in clearing houses without any one dreaming that they are not paid, and for the rest of which the same money suffices in succession, the less being needed the more rapid the circulation is."

This court in Gettys v. Newburger, supra, in an opinion by the late Judge Sanborn, after defining gambling transactions, said: "On the other hand, there are lawful customary and generally prevailing methods of closing out such contracts, settling them and discharging the obligations of the parties thereunder which do not render such contracts wagering contracts or illegal, to wit: (1) By sales; (2) by direct set-offs; and (3) by ringing off before the times of delivery specified in the contracts arrive, so that when those times come no liability to deliver or to pay will exist, and if the parties, when they make such a contract intend not to deliver or to pay for the commodity at the time fixed in the contract therefor because they intend to close out the contract and to settle their obligations thereunder by the use of these lawful methods before the time fixed for the delivery arrives, that intention not to pay or deliver is consistent with the laws and the public policy regarding wagers and it does not make or tend to prove such a contract a wagering contract, illegal or void."

In the instant case, the defendant Dickson, on direct examination, said: "There was no intention on my part at any time to accept delivery of wheat that I bought or make delivery of wheat that I sold. I have never been in any other business but the clothing business. I was never interested in any elevator. I am not a grower of wheat. I could not have made any preparations to accept delivery. I would not have been financially able to have bought the wheat and paid for it."

On cross-examination, however, he testified as follows:

"Q. Did he (Mr. McDonough, plaintiff's agent at Carrollton) tell you the deals would be handled by the Uhlmann Grain Company on those Boards of Trade? A. Yes, sir. * * *

"Q. So there were a lot of those transactions that were handled either because you told him what to do, or acquiesced in what he did for you? A. I suppose so.

"Q. Every one of those transactions he handled for you in the way you have described, was done either because you told him beforehand to close it out, or because he closed it out and later you told him it was all right? A. Yes, sir. * * *

"Q. I am asking you if it isn't a fact that is what you did before the delivery month arrived, you sold out your purchase and you bought out your sales? A. I suppose it was.

"Q. And that is what you intended to do all along in all of these dealings that you had? A. Sell out without delivery?

"Q. Yes, sir; and buy out without a purchase before the time came around, and that

is what you did whenever you exercised your own judgment, didn't you? A. I suppose."

Another one of the defendants testified:

"Q. Now, whenever any of those contracts were entered into between you and as you say, Mr. McDonough, that you made a purchase, for instance, did you later make a sale against that purchase before delivery time came? A. Yes, sir.

"Q. Did that in every instance? A. Always.

"Q. Never did anything else? A. No, sir. * * *

"Q. That is to say, before the time of delivery arrived you were going to get rid of your contract, that is the way you intended to do when you first started to deal with Mc-Donough? A. That is the instructions I gave to him.

"Q. And he carried them out, didn't he? A. Yes, sir."

This testimony, which is typical of that submitted on behalf of all the defendants, and so stipulated, shows that it was the intention and understanding of the defendants that all of these transactions were to be consummated by plaintiff as their broker upon the contract markets named, and that the transactions were actually consummated by the plaintiff in accordance with their purpose, intention, and understanding.

The validity of these contracts seems to be conclusively established by Gettys v. Newburger, supra. This court has consistently so held in a long line of cases following Gettys v. Newburger. In Mullinix v. Hubbard, supra, where the validity of a similar contract was upheld, this court, speaking through Judge Lewis, said: "As already stated, there was no delivery on any of these contracts, but before delivery dates were due they were all closed out by the lawful, customary and generally prevailing methods permitted by the rules and regulations of the exchange and its clearing house, and Bryant's intention when he made his contracts that they should be closed out in that way did not render them wagering contracts."

In Lyons Milling Co. v. Goffe & Carkener, supra, in an opinion by Judge Phillips, it is said: "The fact that contracts for future delivery are closed out before delivery is due, by set-off or ringing off in accordance with the rules and regulations of the Board of Trade and its clearing house, and the fact that a purchaser so intended to close out a contract before delivery was due, does not make the contract a wager and invalid."

The burden of proof was on the defendants to prove that the trades here involved were gambling transactions. This burden they have not sustained, and there was no substantial evidence to sustain the court's finding which branded these contracts as gambling transactions.

It is urged, however, that the transactions were void under certain Missouri statutes. Section 4316 of the Revised 1929 Missouri Statutes makes the carrying on of a "bucket shop" a felony. Section 4317 attempts to define the term "bucket shop" and transactions within the ban of the statute. The test is whether in fact there was an actual purchase and sale, or sale and purchase, for or on account of the parties to the contract. We have here held that there was such a sale and purchase of grain for future delivery at a designated contract market in accordance with the provisions of the Grain Futures Act and the rules prescribed by such markets. Neither the Missouri Statutes, nor the decision of the Supreme Court of Missouri in State v. Christopher, 318 Mo. 225, 2 S.W.(2d) 621, 630, has any application to purchases of grain for future delivery made at duly designated markets. In that case the Supreme Court of Missouri said: "We accordingly hold, until federal authority declares otherwise, that the effect of the Grain Futures Act was to restrict the operation of state laws, like our section 3574, so as to make them inapplicable to transactions coming within the terms of the Grain Futures Act, conducted on a 'contract market' according to the rules prescribed by that market."

There is both reason and authority for holding that Congress, having entered the legislative field with respect to transactions in grain futures at designated contract markets, has superseded and displaced all state laws and legislation regarding such dealings. Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 597, 66 L. Ed. 735, 23 A. L. R. 229; Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518; Board of Trade of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839; Chamber of Commerce of Minneapolis v. Federal Trade Commission (C. C. A.) 13 F.(2d) 673; Hoyt v. Wickham (C. C. A.) 25 F.(2d) 777; State ex rel. Burnett v. Rosenbaum Grain Co., 115 Kan. 40, 222 P. 80; Goffe & Carkener v. Henneberger, 132 Kan. 211, 294 P. 672. However, it is not necessary to decide whether the Grain Futures Act supersedes the Missouri Statute, further than the Missouri court has itself held.

The state statute could not affect transactions at a contract market. It appears in this case that plaintiff merely extended the facilities of its Kansas City office into Carrollton, by making available there much the same service and information to be had at the contract market. Any one of the defendants could have gone into either of these contract markets, through a broker, and made these purchases and sales. This in effect was done at Carrollton, using the agency employed by plaintiff at that place to effectuate the transactions.

These transactions involved interstate commerce, and, if the Missouri Statute relied upon created a burden on- or interfered with interstate commerce, then it was immaterial whether that burden was substantial or incidental, because, when Congress has acted with reference to a matter confided to it by the Constitution, then its statutes displace and supersede all conflicting state legislation touching the matter. Gulf, etc., R. Co. v. Hefley, 158 U. S. 98, 15 S. Ct. 802, 39 L. Ed. 910; Missouri, etc., R. Co. v. Harris, 234 U. S. 412, 34 S. Ct. 790, 58 L. Ed. 1377, L. R. A. 1915E, 942; Asbell v. Kansas, 209 U. S. 251, 28 S. Ct. 485, 52 L. Ed. 778, 14 Ann. Cas. 1101; Lake Shore, etc., R. Co. v. Ohio, 173 U. S. 285, 19 S. Ct. 465, 43 L. Ed. 702; Smith v. Turner, 7 How. 396, 12 L. Ed. 702.

In the Grain Futures Act (section 3) it is recited that: "Transactions in grain involving the sale' thereof for future delivery as commonly conducted on boards of trade and known as 'futures' are affected with a national public interest; that such transactions are carried on in large volume by the public generally and by persons engaged in the business of buying and selling grain and the products and by-products thereof in interstate commerce; that the prices involved in such transactions are generally quoted and disseminated throughout the United States and in foreign countries as a basis for determining the prices to the producer and the consumer of grain and the products and by-products thereof and to facilitate the movements thereof in interstate commerce." (7 USCA § 5.)

The act was sustained by the United States Supreme Court in Board of Trade of Chicago v. Olsen, supra, as a regulation of interstate commerce.

When the lower court held that the plaintiff was engaged at Carrollton in purely intrastate commerce, it failed to give effect to the declarations of the Grain Futures Act,

and failed to recognize that this local agency was a part of the national and international market and agency for the handling and sale of grain or grain futures. Stafford v. Wallace, supra.

As the case must be reversed for the errors already considered, it is not deemed necessary to discuss other contentions of appellant.

The judgment appealed from is reversed, and the cause remanded for further proceedings not inconsistent herewith.

VAN VALKENBURGH, Circuit Judge (concurring).

In view of the importance of the question at issue, affecting, as it does, a very necessary unit in our industrial life, I desire to add my reasons for concurrence in the able main opinion in this case.

The Uhlmann Grain Company is a member in good standing of the boards of trade of Kansas City, Mo., Chicago, Ill., and Minneapolis, Minn., and through a representative operates upon the board of trade or grain exchange of Winnipeg, Canada. In Missouri, at the time under consideration, it had a branch office in Carrollton, in charge of one McDonough. Through this office the manager communicated for final confirmation and disposition of all grain trades with the parent house or houses. It is conceded, and is so stated by the court in its findings of fact, that all the requirements of the Grain Futures Act (7 USCA §§ 1–17) were met in the procedure adopted in the transaction here under consideration. The finding of the court is merely that such transactions were fictitious and the regularity of the procedure merely a sham and cover for such. With this concession it is necessary only to apply the law applicable to such situations.

To begin with, then, where contracts for the purchase and sale of grain on exchanges are fair on their face and presumptively lawful, regardless of the undisclosed intention of the defendant purchaser, the burden is on such defendant to prove that the transactions were mere wagers on the fluctuations of the market. Wilhite v. Houston (C. C. A. 8) 200 F. 390; Clews v. Jamieson, 182 U. S. 461, 21 S. Ct. 845, 45 L. Ed. 1183; Lyons Milling Co. v. Goffe & Carkener (C. C. A. 10) 46 F.(2d) 241.

In this case defendants rely upon their statement to the broker that they did not intend at any time to take any grain as purchasers nor to fulfill any orders as sellers.

That this was communicated to the broker's representative, who assured defendants that they could be protected against such a situation by hedging or sales prior to the date of maturity. There is no contention that the other parties to the contract, towit, the dealers upon the foreign boards of trade, expressed any such intention or were cognizant of such expressed intention. That such was the understanding is explicitly denied by Mr. McDonough, and all the contracts and documents entered into were in approved form for legitimate dealing upon the boards of trade in question. Of these contracts, and their import, the defendants are conclusively proved to have had knowledge. Their testimony concedes that they knew these orders were being placed for them by the broker upon the foreign boards of trade. These transactions were in the nature of spreads or hedging operations and consisted largely of sales upon the Winnipeg board and corresponding purchases upon the Chicago Board of Trade or the converse. Thus in advance it was known that one trade was intended to offset the other, and any such trade was subject to being closed out before the future date of maturity of the contract. Such an operation has been repeatedly and authoritatively held to be valid, and this is true independently of the Grain Futures Act, or whether Congress has entered and appropriated this field, where the operation is otherwise a legitimate and legal one in the jurisdiction where it is consummated. Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 S. Ct. 637, 49 L. Ed. 1031; Clews v. Jamieson, 182 U. S. 461, 21 S. Ct. 845, 45 L. Ed. 1183; Cleage v. Laidley (C. C. A. 8) 149 F. 346; Gettys v. Newburger et al. (C. C. A. 8) 272 F. 209; Mullinix v. Hubbard (C. C. A. 8) 6 F.(2d) 109; Hoyt v. Wickham (C. C. A. 8) 25 F.(2d) 777; Lyons Milling Co. v. Goffe & Carkener (C. C. A. 10) 46 F.(2d) 241.

And, where a defendant employs brokers to purchase and sell grain for him on commission at various exchanges, the brokers having no interest in the purchases and sales other than as defendant's brokers, their relation is not affected by the fact that in executing defendant's orders the brokers assume the position of principals toward those with whom they deal. Wilhite v. Houston (C. C. A. 8) 200 F. 390. There is nothing in this evidence to indicate that the dealings were between plaintiff and defendants as such principals. On the contrary, the entire testimony shows that the transactions were between defendants and principals upon the several boards of trade, whose identity could have been disclosed at any time upon application. There is no testimony which indicates that there was any irregular procedure upon those grain exchanges. Defendants, having lost in their grain speculations, seek to charge the principals upon those exchanges with their asserted knowledge of the representative of appellant in charge of the Carrollton office. The record both from the standpoint of actuality or legal presumption totally fails to establish this contention.

The trial court evidently based its conclusion upon the case of State v. Christopher, 318 Mo. 225, 2 S.W.(2d) 621. In the first place the Missouri law is out of the picture, because it is conceded that none of the sales involved took place or were consummated upon the Kansas City Board of Trade; but it is somewhat instructive to consider further the basis of the Christopher decision. Its holding necessarily was that trades initiated through the Sedalia branch of the Kansas City Board of Trade were not conducted upon a contract market, but that such operations were confined to the Sedalia house, which was, in and of itself, not a contract market. It assumed, therefore, that the dealings were between the customer and the Sedalia house, which was thus conceived to be a bucket shop.

The trial court applied this same situation to the branch at Carrollton. This contention obviously cannot be sustained. So long as the ultimate consummation of the transactions was upon the contract market either at Kansas City, Chicago, or Minneapolis, it matters not that they were initiated for convenience, in the branch houses of such markets. It is essential that such outlying houses should be disconnected in substance and in fact from parent grain exchanges to justify the conclusion of the Missouri Supreme Court and of the court below. With this proposition established, the conclusion of both such courts falls, but it is further to be observed that the Supreme Court of Missouri was not dealing with the statute of that state which forbids dealing in grain futures except with the intention to take or deliver the grain dealt in, but with section 3574 Rev. St. Mo. 1919, which makes it a misdemeanor for any person to keep a place wherein is permitted pretended buying and selling of stocks, grain, and other products without any intention of receiving and paying for the property bought, or delivering the property sold; and the opinion concedes

that the Grain Futures Act of Congress does regulate, forbid, or make lawful any contract for the future delivery of grain where made in a contract market, designated as such by the Secretary of Agriculture. In so holding the Supreme Court of Missouri is in harmony with the weight of authority and with the purpose and intendment of the Grain Futures Act. See State ex rel. v. Rosenbaum Grain Company et al., 115 Kan. 40, 222 P. 80; Lyons Milling Company v. Goffe & Carkener (C. C. A. 10) 46 F.(2d) 241. See, also, the decision of the same District Court, from which this appeal is taken, in Board of Trade of Kansas City v. Gentry,[1] in which the trial judge in this case sat as one of the three judges. But the effect of the Grain Futures Act is sufficiently disclosed by the decisions of the Supreme Court in construing that act.

In Stafford v. Wallace, 258 U. S. 495, 528, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229, it is pointed out that the various stockyards of the country are great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East. They conduct a business affected by a public use of a national character and subject to national regulation.

In Board of Trade of City of Chicago v. Olsen, 262 U. S. 1, 43, 43 S. Ct. 470, 477, 67 L. Ed. 839, this same principle is held to apply to the grain business upon boards of trade. It has been held, and is universally recognized, that such boards of trade or contract markets are essential to transactions in grain and kindred products, not only from the standpoint of those who sell upon such boards, but from that of the quotations upon which producers depend for their information. Such was the view of Congress in establishing these grain markets and entering this field of regulation, and such is the construction placed upon this legislation by the Supreme Court of the United States.

It must inevitably happen that there will be irregularities and abuses, but so long as transactions are conducted in accordance with the rules and regulations of such contract markets, disgruntled speculators cannot be heard to complain and to repudiate their legal obligations upon such ground. It is true that, if a house is established to be a mere bucket shop, apart from and disconnected with any contract market, then the provisions of law against gambling in fu-

tures, or otherwise, apply. That Congress has entered and appropriated this field, as I have said, is evident from the decision in the Olsen Case in addition to the rulings already cited. This is the necessary import of the following language in that case: "In the act we are considering, Congress has expressly declared that transactions and prices of grain in dealing in futures are susceptible to speculation, manipulation, and control which are detrimental to the producer and consumer and persons handling grain in interstate commerce and render regulation imperative for the protection of such commerce and the national public interest therein. * * * Sales of an article which affect the country-wide price of the article directly affect the country-wide commerce in it. By reason and authority, therefore, in determining the validity of this act, we are prevented from questioning the conclusion of Congress that manipulation of the market for futures on the Chicago Board of Trade may, and from time to time does, directly burden and obstruct commerce between the states in grain. and that it recurs and is a constantly possible danger. For this reason, Congress has the power to provide the appropriate means adopted in this act by which this abuse may be restrained and avoided. * * * The Board of Trade conducts a business which is affected with a public interest and is, therefore, subject to reasonable regulation in the public interest."

The mere fact that no grain was actually delivered or received pursuant to purchases and sales, but that the sales and purchases were set off against others according to the custom of exchanges, does not show that the transactions were illegal. Wilhite v. Houston (C. C. A. 8) 200 F. 390. All the more is this true where the very nature of the transaction was in its inception a spread or set-off dealing, which has been expressly held to be lawful. It is in evidence that some of these defendants would have been able to respond to their obligations under the contract entered into, but this is not essential. Contracts in every day affairs are entered into, and pecuniary liabilities thereby established irrespective of the financial ability of a party to respond thereto; nor can it be expected that brokers and parties upon contract markets must be put to investigation of a customer's financial rating before permitting transactions upon such markets.

The situation is conclusively disposed of by Mr. Justice Holmes in his opinion in

---

[1] No opinion filed.

Board of Trade of Chicago v. Christie Grain & Stock Company, 198 U. S. 250, 25 S. Ct. 637, 49 L. Ed. 1031, as shown in Judge Gardner's opinion.

KENYON, Circuit Judge (dissenting).

It seems to me that the purported sales and purchases which appellant claims were carried on for the various appellees were nothing but fictitious operations and were gambling transactions. The fact that they may be termed "dealings in grain futures" sanctioned by the Federal Grain Futures Act does not remove the odor of bucket shop transactions surrounding them. Carrollton was a small town in Missouri at which plaintiff through an agent operated an office. This office was in the basement of the Florence Hotel. It consisted of a roll-top desk, some chairs where the prospective victims might rest, a blackboard where they might study figures which they could not understand, a desk for telegraph instruments, a typewriter, and some other paraphernalia that added a touch of mystery to the situation. There was a private telegraph wire communicating with the Kansas City office of appellant. Here sat throughout the day some of the citizens of Carrollton and vicinity who expected to grow rich rapidly by gambling in the purchase and sale of imaginary commodities. The testimony shows that the defendants dealt in over three million bushels of grain during the short time that plaintiff had its office at Carrollton. The evidence shows there were some forty odd other customers. If they had been equally as desirous of buying grain and selling the same as were the defendants, there would have been more bushels of grain purchased and sold than possibly could have been produced in the county in which Carrollton was located and adjacent counties thereto, and, if it had been delivered, these customers, consisting of an ice dealer, an employee in a printing office, some farmers, an insurance agent, a country merchant, a laundryman's wife, and an undertaker's employee, would have sought in vain for some place in which to store the products. Of course what they were doing was merely betting on the advance or fall in the price of grain with no intention of actually purchasing or selling any grain. I am so well satisfied that the trial court was right in holding these transactions to be pure gambling transactions that I am unwilling to agree that they were legal. Therefore feel compelled to dissent from the majority opinion.