No. 32,399

Ellis Clark, as Receiver for the Pretty Prairie Coöperative Grain Company, *Appellee*, v. C. W. Murphy et al., *Defendants;* C. W. Murphy, Amos Stucky, Jacob B. Graber and P. J. Krehbiel, *Appellants.*

(49 P. 2d 973)

Opinion filed October 5, 1935.

*C. M. Williams, D. C. Martindell, W. D. P. Carey, J. N. Tincher, Clyde Raleigh* and *Leaford F. Cushenbery,* all of Hutchinson, for the appellants.

*A. C. Malloy, Roy C. Davis, Warren H. White, Frank S. Hodge* and *Ellis Clark,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

Harvey, J.: This was an action by the receiver of an insolvent coöperative grain company, a corporation, hereinafter called the grain company, against its directors for the sum of $11,814.77, being the amount of the company's money lost by it in certain transactions on the board of trade at Kansas City, Mo., which transactions were authorized by the directors and which plaintiff alleges were *ultra vires* and therefore unlawful. Defendants deny the transactions were of that character. A jury trial resulted in a verdict and judgment for plaintiff for the amount claimed against four of the directors. They have appealed.

Certain individual appellants contend the judgment for the full amount cannot be sustained against them in any event for the reason they were directors but a short time, during which only small losses occurred. In the view we take of the case, however, it will not be necessary to analyze these contentions.

Much is said in the record and briefs about "stored wheat." It seems some wheat growers did not want to sell their wheat when they delivered it to the elevator, thinking the market price would be

higher a few months later. The grain company orally agreed with them to take their wheat and to pay for it on some future date when the grower asked for settlement, and at the market price on that date. Some of such wheat growers bought feed, fuel, or other merchandise, to be settled for when they settled for their wheat. We think these circumstances have no bearing on the legal questions determinative of this case. The grain company was not a licensed warehouse under R. S. 1933 Supp. 34-224 *et seq.* It issued no warehouse receipts. It simply agreed to pay for the wheat on the day the grower wanted to settle for it at the then market price. The grower did not expect his wheat to be redelivered to him at some future time. All he expected was to be paid for it. The relation between the parties growing out of this transaction appears to have been nothing more than the relation of debtor and creditor. But we need not analyze this situation further, nor determine more definitely questions discussed on this phase of the case, for none of such wheat growers brought this action; they are not parties to it; their rights and liabilities are not involved and were not determined in the trial court.

The grain company was organized in 1920, under R. S. 17-1501 to 17-1515, "to engage in the business of buying, selling and handling of grain, feed, fuel, supplies and produce, and the engaging in all kinds of business usually carried on by farmers' elevator and supply companies." Its authorized capital stock was $50,000, divided into 250 shares of the par value of $200 each. Originally $4,800 of stock was subscribed, but in 1931 a few additional shares were sold. It appears never to have been a strong financial institution. The business of the company was controlled by a board of five directors. They elected a manager, who conducted the business under their direction. Plaintiff alleges that during the period from June 1, 1931, to May 1, 1933, defendants, as officers and directors of the grain company, caused and permitted the assets of the company to be dissipated, wasted and lost by wrongful and unauthorized purchases and sales of grain upon the board of trade, which purchases and sales were purely of a speculative and gambling character. The record discloses that during the time in question the elevator took in and sold about 360,000 bushels of wheat. The market price of wheat during that time was almost constantly declining, resulting in losses to the grain company on wheat purchased and sold. During the time covered by this inquiry the grain company had thirty-three transac-

tions on the board of trade at Kansas City, all of these being purchases or sales of wheat. On seventeen of the transactions it made profits, and it sustained losses on sixteen of them. The aggregate losses, however, exceeded the aggregate profits, with the result that the net losses of the grain company in such transactions amounted to $11,814.77, the amount sued for in this action. It appears to be plaintiff's theory that these transactions were all speculative and gambling transactions, hence *ultra vires*, and being so were unlawful to the extent of the net loss. There appears to be no objection to such transactions when the grain company made a profit, nor even when it sustained a loss if on the whole profits equalled or exceeded losses.

Appellants' principal contention is that none of the transactions shown by the evidence were *ultra vires* or unlawful. It is argued that the charter of the corporation authorized it to buy or sell grain, which includes wheat; that this authority to buy and sell grain was not limited locally to the town or community in which its elevator was located; hence, that so far as its corporate authority was concerned it had authority to buy or sell wheat in Kansas City, Chicago, or elsewhere, from or to any person, or on the board of trade. They further contend that since all the transactions complained of were interstate in character, all of them being on the board of trade at Kansas City, the legality of the transactions is governed by the federal grain futures act. The federal act (U. S. C. A., Title 7, ch. 1, § 6), so far as here pertinent, provides it to be unlawful for any person to deliver through the mails, or in interstate commerce, any contract for sale of grain for future delivery or confirmation of such contract which may be used for hedging any contracts in interstate commerce in grain, or determining the basic price of such a transaction, or delivering grain sold, shipped, or received in interstate commerce, *except*

"(*b*) Where such contract is made by or through a member of a board of trade which has been designated by the secretary of agriculture as a 'contract market,' as hereinafter provided in this chapter, and if such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery: *Provided,* That each board member shall keep such record for a period of three years from the date thereof, or for a longer period if the secretary of agriculture shall so direct, which record shall at all times be open to the inspection of any representative of the United States Department of Agriculture or the United States Department of Justice. (Sept. 21, 1922, c. 369, § 4, 42 Stat. 999.)"

Appellee contends that the federal act has no bearing on the case, but that it is controlled by our so-called "bucket shop" statute (R. S. 50-121 to 50-130). We had occasion to consider the effect of the federal act and our statute upon interstate transactions of this character in *State, ex rel., v. Rosenbaum Grain Co.*, 115 Kan. 40, 222 Pac. 80, where, in an exhaustive opinion by Mr. Justice Burch, reviewing and analyzing earlier decisions and the purposes of the federal act, it was held that with reference to interstate transactions of this character the federal act, and regulations thereunder, are exclusive. We need not restate or enlarge upon what was there said other than to note that interstate transactions pertaining to the purchase or sale of grain have been held, in later cases, to be legitimate transactions and not to be gambling transactions, or otherwise unlawful. (*Goffe and Carkener v. Henneberger*, 132 Kan. 211, 294 Pac. 672; *Wolcott-Lincoln, Inc., v. Huff*, 139 Kan. 366, 31 P. 2d 13; *Noll v. Boyle*, 140 Kan. 252, 36 P. 2d 330.) More than that, our legislature, in 1925 (Laws 1925, ch. 6, R. S. 1933 Supp. 2-1601 to 2-1604) recognized the federal act and contract market as therein defined, and further provided that boards of trade in this state which had not been designated by the secretary of agriculture as contract markets, under the act of congress, were by this statute declared to be contract markets and affected with the public interest.

In *Dickson v. Uhlmann Grain Co.*, 288 U. S. 188, it was held that the federal act did not supersede the statutes of the state of Missouri pertaining to future dealings in grain with respect to a transaction which was wholly intrastate in character. There it had been found by the trial court that Dickson did not contemplate the execution on his behalf by the brokers with whom he dealt of contracts outside the state, hence that the transactions were intrastate transactions governed by the statutes of Missouri and not by the federal act. This is not in conflict with our decisions, previously cited, pertaining to interstate transactions.

The record clearly discloses that all the transactions complained of by plaintiff were interstate transactions. The Kansas City board of trade has been designated a contract market by the secretary of agriculture, under the authority of the federal statute above cited; this is not controverted. The record shows that all the transactions complained of were recorded and the records preserved in harmony with the federal act; hence, these transactions were not unlawful. It is not contended that the grain company was without authority

to buy or sell wheat outside of the state of Kansas. Being lawful transactions, within the corporate powers of the grain company, they were not *ultra vires*.

The result is, the theory on which plaintiff predicated his action is not well grounded and defendants' demurrer to plaintiff's evidence should have been sustained. The judgment of the trial court is reversed, with directions to render judgment for defendants.