**BOMEISLER et al. v. M. JACOBSON & SONS TRUST.**

**M. JACOBSON & SONS TRUST v. BOMEISLER et al.**

Nos. 3627, 3628.

Circuit Court of Appeals, First Circuit.

March 17, 1941.

Marcien Jenckes, of Boston, Mass. (Wm. A. Dupee, Jr., and John B. Reigeluth, both of Boston, Mass., on the brief), for plaintiffs.

Frank. P. Ryan, of Worcester, Mass. (Samuel Perman and Berge C. Tashjian, both of Worcester, Mass., on the brief), for defendant.

Before MAGRUDER and MAHONEY, Circuit Judges, and PETERS, District Judge.

MAGRUDER, Circuit Judge.

█ This suit was brought to recover $5,458.34 advanced by a brokerage firm in executing purchases and sales of contracts for the future delivery of hides on the New York Commodity Exchange, allegedly for the defendant's account. By counterclaim the defendant sought to recover $7,-933.39, representing the amount by which the defendant's payments exceeded its receipts from the account. Jurisdiction is founded on diversity of citizenship.[1]

At the trial below, the case was allowed to go to the jury despite the defendant's motion for a directed verdict at the close of the evidence. Verdicts for the plaintiffs were returned in both the original suit and the counterclaim, and judgment was entered accordingly. On the same day, the defendant moved that this judgment be set aside and "that judgment be entered for the defendant in accordance with its motion for a directed verdict"; no motion in the alternative for a new trial was made. Four days later, acting under Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the District Judge entered an order reopening the judgment, setting aside the verdict and giving judgment for the defendant on the original suit, but leaving undisturbed the verdict and judgment in the counterclaim. From this order and judgment both parties appeal.

█ The questions presented for our consideration involve the legality of certain contracts and the authority of one of the defendant's trustees, Eli Jacobson, to enter into them for defendant's account. The evidence below consisted of documentary exhibits, testimony of an employee and a member of the plaintiff partnership and of a single trustee and the bookkeeper of the defendant. Two of the defendant's trustees did not testify. Regarded in a light most favorable to the plaintiffs, this evidence tended to show the following facts:

The defendant is organized as a Massachusetts business trust, pursuant to Mass. Gen.Laws (Ter.Ed.), c. 182, § 1 et seq. Its deed of trust declares its purpose to be "to buy, sell, import and export live stock of al kinds and to deal in meats and meat products in all its branches * * * to slaughter. live stock of all kinds, and deal generally in hides and all other animal products; particularly to carry on the business * * * known as the Chicago Dressed Beef Co. * * *." The actual business of the defendant conforms closely to these declared purposes, and the sale of hides from slaughtered animals constitutes a substantial if minor item in the business. "Chicago Dressed Beef Company" remains the principal trade name.

The entire beneficial interest, evidenced by shares, is held by five brothers and their mother. The shares are transferable except that before any share can be sold the trustees are given a 30-day option to buy it in at book value. The shareholders retain the right to call meetings, and by majority vote to elect successor trustees, fix the trustees' compensation, authorize the issuance of additional certificates of beneficial interest, and terminate the trust.

Three of the brothers are also trustees with general powers of management, Nathan Jacobson as president, Eli as treasurer and Robert as secretary and assistant

---

1 Each of the partners in the plaintiffs' firm is a citizen of a state other than Massachusetts. By stipulation filed in this court pursuant to 28 U.S.C.A. § 399, it appears that "at all times involved in the within litigation" all of the trustees and all of the shareholders in M. Jacobson & Sons Trust have been residents of Worcester, Massachusetts. See Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842; Thomas v. Board of Trustees, 195 U.S. 207, 25 S.Ct. 24, 49 L.Ed. 160; Spencer v. Patey, 2 Cir., 243 F. 555.

treasurer. There is apparently no precise allocation of duties among the trustees; Eli stated at the trial that "We all individually acted from time to time as we saw fit in our capacities as three managers of the business. In connection with buying cattle, Nathan Jacobson did not consult me before he bought cattle unless it was perhaps a big deal. Then we would talk it over. In the usual run of business he would buy the cattle and he would pay for them on checks that he drew and Robert Jacobson, without consulting me, made sales of the products as they came through. I did most anything, sell and buy, talk things over with them with reference to any purchase that was greater than they thought they would be responsible for, things of that sort. As treasurer, I handled the borrowing. The assistant treasurer, that is Robert, also had authority but I had authority to borrow money for the trust on my single signature."

The two remaining brothers also take a part in the business and have attended some if not all of the trustees' meetings where they have voted to authorize various transactions. Why their presence or vote should have been thought requisite does not appear.

The plaintiffs are partners conducting a brokerage business on the New York Commodity Exchange.

In 1936 Eli Jacobson opened an account with the plaintiffs, in the name of the Chicago Dressed Beef Company, for the purchase of contracts on margin for the future delivery of hides. Because the account was carried in the name of a firm with established credit, the plaintiffs dispensed with certain margin requirements regularly imposed upon individuals. Over the course of some two years and a half, Eli ordered the purchase of approximately 50 futures contracts for the defendant's account. Each contract, as is customary in hides futures, involved approximately 40,000 pounds of hides with an average value of $4,000. Immediately after each order a purchase of a contract was actually made by the plaintiffs on the exchange, and the contract was held for the defendant. In accordance with the rules of the exchange, the plaintiffs traded as principals in relation to the broker selling the contract. The contracts were always sold on Eli's order before the time of delivery of the hides. From time to time balances were struck and either the plaintiffs would send a check to the Chicago Dressed Beef Company rep-

resenting net profits, or (as more often happened) Eli would mail the plaintiffs a check of the Jacobson Trust to make up losses. In all, seven checks were mailed from the plaintiffs to the defendant and 16 from the defendant to the plaintiffs. Of the latter 16, 14 were signed by Eli and two by Robert Jacobson, the assistant treasurer.

Each purchase and sale was followed by one or more letters addressed to the Chicago Dressed Beef Company confirming the completion of the transaction. In addition, occasional statements of account were transmitted to the defendant for approval. The volume of this correspondence cannot be estimated precisely, but it appears that well over 120 letters were mailed from the plaintiffs to the defendant in connection with these dealings. The correspondence was handled almost exclusively by Eli.

Except for the first transaction, which resulted in a small profit pocketed by Eli, all checks to or from the plaintiffs appear on the books of the Jacobson Trust, and the losses were reflected in the final reports of the trust's financial position which were considered by the trustees and approved at annual meetings.

The jury below was instructed that in order to bring in a verdict for the plaintiffs, they must find that the purchases of futures contracts were within the authority of the trustees, who must have unanimously approved the transactions. This approval, the jury was informed, might be achieved by delegation of authority or by knowledge of and acquiescence in a course of dealing. To this charge the defendant apparently made no objection. See Rule 51, Federal Rules Civil Procedure. While the District Judge did not state his reason for overturning the verdict, three possible grounds for his action are suggested. If any one of these is sufficient to defeat the plaintiffs' right of recovery, we must affirm the judgment appealed from.

First, it is urged that the contracts between the plaintiffs and defendant were gaming contracts, illegal and therefore unenforceable. It is pointed out as significant that during the entire course of dealing the defendant never took delivery of a single consignment of hides; that the contracts were all bought on margin; and that the transactions took place on one of the most highly speculative of all markets.

Aside, however, from the fact that deliveries were not made, there is no com-

pelling evidence that the plaintiffs contemplated the striking of occasional balances as the inevitable conclusion of each set of transactions. Moreover, and more important, purchases were intended and took place on every transaction; not purchases of actual hides, it is true, but purchases of contracts subjecting the plaintiffs to legal liability for the full purchase price thereof. In this connection it is significant that the Massachusetts statute, making voidable certain types of wagering contracts in securities, expressly excepts situations in which the "other party to the contract or the person so employed makes, in accordance with the terms of the contract or employment, personally or by agent, an actual purchase or sale of said securities or commodities, or a valid contract therefor." Mass.Gen.Laws (Ter.Ed.) c. 137, § 4. The Massachusetts Supreme Judicial Court has from time to time considered cases in which long courses of margin trading on the stock exchange have been unaccompanied by any delivery of securities but have terminated in the striking of balances. In practically every case judgment has gone for the stockbroker as against the purchaser's contention of illegality, sometimes by way of directed verdict. Ryan v. Whitney, 257 Mass. 218, 153 N.E. 449; Harris v. Friedman, 245 Mass. 479, 139 N.E. 788; Bazirgan v. Arnold & Sears, Inc., 275 Mass. 207, 175 N.E. 483; cf. Savoy Finance Co. v. De Biase, 281 Mass. 425, 183 N.E. 742. These decisions, involving facts almost exactly analogous to those of the present case, are conclusive upon us if the Massachusetts law governs. See, also, In re Rosenbaum Grain Corp., 7 Cir., 103 F. 2d 656. Since the futures were purchased in New York, it may be that the validity of the contracts between the plaintiffs and the Jacobson Trust should be governed by New York law. We need not decide this point since the law of that state is at least equally favorable to the broker. Scandinavian Import-Export Co. v. Bachman, 195 App.Div. 297, 186 N.Y.S. 860; see Hurd v. Taylor, 181 N.Y. 231, 233, 73 N.E. 977; cf. Smith v. Craig, 211 N.Y. 456, 460, 105 N.E. 798, Ann.Cas.1915B, 937. We therefore hold that the contracts in question are valid.

Granted the validity of the contracts, the problem is next presented whether the plaintiffs' claim is enforceable against the Jacobson Trust or only against Eli.

We assume, without deciding, that the aggregate powers reserved by the shareholders do not render them partners under the Massachusetts decisions. See Williams v. Milton, 215 Mass. 1, 102 N.E. 355; Dana v. Treasurer, 227 Mass. 562, 116 N.E. 941; Flint v. Codman, 247 Mass. 463, 142 N.E. 256; Downey Co. v. Whistler, 284 Mass. 461, 188 N.E. 243; First National Bank of New Bedford v. Chartier, 305 Mass. 316, 25 N.E.2d 733; Gutelius v. Stanbon, D.C., 39 F.2d 621. We assume also, without deciding, that Eli Jacobson in his dealings with the plaintiff firm could not bind the trust without the concurrence, in some form, of his co-trustees.

■ However, unanimity may be achieved by subsequent ratification of the acts of a single trustee. Bowen v. Farley, 256 Mass. 19, 152 N.E. 69; Zevitas v. Adams, 276 Mass. 307, 177 N.E. 114; Rand v. Farquhar, 226 Mass. 91, 115 N.E. 286. And such ratification may be inferred from knowledge of a course of dealing and failure to object to it. Horgan v. Morgan, 233 Mass. 381, 124 N.E. 32. The question presented for our consideration is, therefore, whether the evidence included facts from which a reasonable jury might have inferred that all three trustees acquiesced in the maintenance of the brokerage account.

■ Eli's knowledge is of course conceded; and Robert's action as assistant treasurer in making out two of the defendant's checks for the plaintiffs would clearly warrant a jury finding of knowledge. As to Nathan, in considering the state of his mind, the following facts seem to us significant. The Jacobson Trust was a closely knit business organization, held by an intimate family group, in which the work of the trustees often tended to overlap. Frequent consultation took place among them, and the books, files and desk in the treasurer's office were open to all. Nathan, as president of the business, was under at least some obligation to know what was going on. A record of the transactions in question was spread upon the defendant's books without concealment and losses incurred in these dealings entered into two years' final reports which were approved by all three trustees. The margin account entailed a voluminous correspondence addressed to the "Chicago Dressed Beef Co." which might well have brought the matter to Nathan's attention. A total of 23 checks, some involving substantial sums, passed between the parties. Finally, the entire course of dealing continued

for over two and a half years. "An examination of the books would have disclosed the facts, and even casual attention to the affairs of the organization would have disclosed how its business was being carried on." Horgan v. Morgan, 233 Mass. 381, 385, 124 N.E. 32.

■ We think the evidence is sufficient to warrant the finding by a reasonable jury of knowledge and acquiescence on Nathan's part. Horgan v. Morgan, 233 Mass. 381, 124 N.E. 32; Nims v. Mt. Hermon Boys' School, 160 Mass. 177, 35 N.E. 776, 22 L. R.A. 364, 39 Am.St.Rep. 467; Hartford v. Massachusetts Bowling Alleys, Inc., 229 Mass. 30, 118 N.E. 188; North Anson Lumber Co. v. Smith, 209 Mass. 333, 95 N.E. 838; Beacon Trust Co. v. Souther, 183 Mass. 413, 67 N.E. 345. It is true that Eli testified that Nathan and Robert were ignorant of the entire course of dealings, but the jury was clearly justified in disregarding this testimony of an obviously interested witness. Moreover, inferences favorable to the plaintiffs' position may legitimately be drawn from the failure of Robert and Nathan to testify. Interstate Circuit v. United States, 306 U.S. 208, especially at page 225, 59 S.Ct. 467, 83 L.Ed. 610; Howe v. Howe, 199 Mass. 598, 85 N. E. 945, 127 Am.St.Rep. 516.

■ It is contended finally that the purchase of futures contracts is not within the scope of the defendant's business. It is certainly true that trustees of the conventional type of non-business trust will not ordinarily be permitted to invest in anything so speculative as futures contracts. See 2 Scott on Trusts, p. 1206. It may well be that in such trusts the trust instrument should be construed strictly in order to afford maximum protection to the beneficiaries. But these rules, evolved to govern the traditional type of trust, cannot be carried over and applied without change in the field of business trusts of the type here presented. The defendant trust was created, not to conserve an estate or guarantee a steady income to certain beneficiaries, but to aggregate the capital contributions of the six associates for the purpose of conducting an extensive and complex business which ordinarily would be carried on by a partnership or a corporation. It can scarcely run with the hares and hunt with the hounds by disclaiming the corporate analogy when this becomes inconvenient. The defendant's powers are of course limited to those conferred by its

deed of trust; but we think this instrument should be considered as analogous to a corporate charter and as broadly interpreted.

■ Under this view, we cannot say that the transactions were beyond the powers of the trustees as a matter of law. According to the deed of trust one of the purposes of the Jacobson Trust was to "deal generally in hides"—a grant of power sufficiently broad literally to cover the transactions in question. In the analogous field of corporate ultra vires a charter power to "buy and sell" a commodity has been held to connote the power to buy and sell on the futures market. Scandinavian Import-Export Co. v. Bachman, 195 App.Div. 297, 186 N.Y.S. 860; Lamson Bros. & Co. v. Turner, 8 Cir., 1921, 277 F. 680; Clark v. Murphy, 142 Kan. 426, 49 P.2d 973. But cf. In re Trion Mfg. Co., D.C., 214 F. 161. In fact, and almost of necessity, the defendant did deal in physical hides to a considerable extent, and there is no doubt but that purchases of futures contracts may be a legitimate and advisable concomitant of trading in a given commodity. The course of dealing, extending over a period of almost three years and involving numerous individual transactions, was (as found by the jury) known to the three trustees and knowledge of it was at least readily available to the three remaining members of the family. Yet no question of its propriety was ever raised until it proved disastrous. We believe, therefore, that it was at least a jury question whether under the circumstances the purchases of these futures contracts were within the scope of this family business, and the jury has specifically found that such purchases were authorized. Cf. Irwin v. Williar, 1884, 110 U.S. 499, 4 S.. Ct. 160, 28 L.Ed. 225. The Supreme Court in that case held that the question of a partner's authority to purchase futures contracts was for the jury, saying (110 U.S. at pages 506, 507, 4 S.Ct. at page 164):

"Dealing in grain is not a technical phrase from which a court can properly infer as matter of law authority to bind the firm in every case irrespective of its circumstances. * * * It may mean dealing in grain on hand for present delivery for cash or on credit, or it may mean, also, dealing in futures by means of contracts of sale or purchase for purposes of speculating upon the course of the market."

Judgment should have been given for the plaintiffs pursuant to the jury's ver-

dict on the complaint. From this it follows, of course, that the defendant was rightly denied recovery on its counterclaim.

The judgment of the District Court is vacated, and the case is remanded to that court, with direction to enter judgment for the plaintiffs in conformity with this opinion.