403 F.2d 16
 In the Matter of BANKERS TRUST, Real Estate Investment Trust of Indiana, Equitable Real Estate Investment Trust, Fidelity Real Estate Investment Trust, Real Estate Investment Trust of Florida, Kings Crown Tally-Ho Inn, Inc., Real Estate Investment Security Company, Inc., and Southway Utility Corporation, Debtors.
 No. 16697.
 No. 16698.
 United States Court of Appeals Seventh Circuit.
 October 31, 1968.
 
 Wayne C. Ponader, David A. Butcher, James W. Treacy, Indianapolis, Ind., John Rogers Camp, Jr., Miami, Fla., John T. Ware, St. Petersburg, Fla., for petitioners-appellants; Rose, Buchanan, McKinney & Evans, Feeney, Tracy & Ward, Indianapolis, Ind., Blackwell, Walker & Gray, Miami, Fla., Ware & Piper, St. Petersburg, Fla., of counsel.
 Sigmund J. Beck, William M. Osborn, Donald Jackson, Indianapolis, Ind., Thomas B. Hart, J. Kirk Windle, Joseph L. Grant, S.E.C., Chicago, Ill., Phillip A. Loomis, Jr., David Ferber, Paul Gonson, Warren G. Stolusky, S.E.C., Washington, D. C., for appellee.
 Before KILEY, CUMMINGS and KERNER, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 This case involves the authority to file and propriety of retaining the Chapter X reorganization petition of Real Estate Investment Trust of Florida ("R.E.I. T.") in the United States District Court for the Southern District of Indiana, instead of dismissing it for want of proper venue or transferring it to the United States District Court for the Southern District of Florida.
 
 
 2
 On October 8, 1966, Bankers Trust, an Indiana real estate investment trust, R.E.I.T. and five subsidiaries of Bankers Trust filed petitions for reorganization under Chapter X of the Bankruptcy Act (11 U.S.C. § 501 et seq.) in the United States District Court for the Southern District of Indiana. Later that month, Southway Utility Corporation, another subsidiary of Bankers Trust, filed its re-organization petition. In the same month, the District Court entered orders approving all eight petitions, consolidated them in the Bankers Trust proceeding, and appointed American Fletcher National Bank and Trust Company of Indianapolis as trustee for the debtors. On November 22, 1966, the court entered an order turning over the assets of twenty-four of the debtors' subsidiary corporations to the reorganization trustee. Similar turnover orders were subsequently entered with respect to two other subsidiary corporations.
 
 
 3
 R.E.I.T.'s reorganization petition described R.E.I.T. as a business trust organized and existing under the laws of the State of Florida. R.E.I.T. likened its status to that of a corporation. It claimed that its principal place of business was in Kokomo, Indiana, and that it was a subsidiary of Bankers Trust. Its principal assets were described as the King's Crown Inn of Fort Lauderdale, Florida, the Colony Shopping Center of St. Petersburg, Florida, and the Medical Towers Building of Fort Lauderdale, Florida. R.E.I.T. was also said to have an interest in assets of five other subsidiaries of Bankers Trust. Its principal liabilities were stated to be mortgages on the King's Crown Inn, the Colony Shopping Center and the Medical Towers Building. According to the petition, R.E.I.T. had about 111,893 shares of stock or certificates of beneficial interest outstanding. The petition was filed by Sigmund J. Beck, Matthew E. Welsh and William E. Shumaker, claiming to be R.E.I.T.'s trustees.
 
 
 4
 R.E.I.T. was organized under a declaration of trust dated February 1, 1962, executed in Indiana and filed in Florida. According to this instrument, the principal office of R.E.I.T. was in St. Petersburg, Florida, which is within the territorial district of the United States District Court for the Southern District of Florida.
 
 
 5
 In December 1966 and January 1967, appellants Morgan H. Hundley of St. Petersburg, Florida, and First Federal Savings and Loan Association of Miami, Florida, respectively filed motions to dismiss the reorganization petition of R.E. I.T., asserting that the District Court had no jurisdiction because R.E.I.T.'s property and principal place of business were in Florida and because it was not a subsidiary of Bankers Trust.[1] Hundley was a holder of beneficial interests in R.E.I.T., and First Federal was the mortgagee of its Medical Towers Building.
 
 
 6
 In May 1967, the District Court held an evidentiary hearing with respect to the motions to dismiss. The evidence showed that R.E.I.T.'s three original trustees resigned on September 12, 1966, and purportedly elected Messrs. Beck, Welsh and Shumaker as successor trustees. R.E.I.T.'s original trustees had organized Bankers Trust and three other Indiana real estate investment trusts, all of them debtors in the consolidated reorganization proceeding. They directed the business of the eight debtors and twenty-six subsidiaries from their Kokomo, Indiana, offices.
 
 
 7
 In late September 1966, appellant Hundley, owning 1,350 R.E.I.T. shares, wrote the other shareholders of that trust, requesting their proxies to elect trustees to replace Messrs. Beck, Welsh and Shumaker. At a meeting on October 6, 1966, the proxies obtained by Hundley and other shares (assertedly totalling 62,498 shares in all) were voted to remove said trustees and to elect Hundley, Donald McCaffrey and Peter K. Barskis as the trustees.
 
 
 8
 At the conclusion of the evidentiary hearing, the District Court found that the September 12, 1966, election of the original trustees' successors was ineffective for want of compliance with some of the terms of the declaration of trust. The court found that the original trustees had "abdicated and abandoned their position as trustees" and that the successor trustees had acted in good faith in filing the reorganization petition in Indiana. The District Court also found that Messrs. Beck, Welsh and Shumaker exercised the powers and duties of R.E.I.T. trustees between their ineffective election on September 12, 1966, and the filing of the Chapter X petition on October 8, 1966. The court pointed out that the successor trustees were faced with great difficulties in managing R.E.I.T.'s affairs during this period. He found that they had successfully deferred the execution sale of R.E.I.T.'s Medical Towers Building in Fort Lauderdale, and that they had received correspondence from R.E.I.T.'s mortgagees threatening the immediate institution of foreclosure proceedings against its properties. The court also found that under the terms of the trust Messrs. Hundley, Barskis and McCaffrey were not properly elected on October 6, 1966.
 
 
 9
 The findings as to the invalidity of both purported elections are not contested on this appeal. The court concluded that Messrs. Beck, Welsh and Shumaker were never validly removed as trustees and were de facto trustees of the trust and were authorized to file the reorganization petition.
 
 
 10
 In addition, the court found that R.E. I.T.'s original trustees had not effectively changed its principal place of business from St. Petersburg, Florida, to Kokomo, Indiana, but that R.E.I.T.'s business affairs were carried on from Kokomo after April 1964. Its principal assets were determined to be in Florida. The court found that R.E.I.T. was not a subsidiary of Bankers Trust, being "an independent, separate Trust set up under the laws of the state of Florida." It found that the original trustees breached their fiduciary duties to R.E.I.T.'s shareholders through control of R.E.I.T.'s affairs by means of subsidiaries owned and controlled by Bankers Trust and the other three Indiana trusts involved in this reorganization proceeding, and that the operating subsidiaries of Bankers Trust were running the daily affairs of R.E. I.T. The court said that any alleged operating agreement between Bankers Trust and R.E.I.T. was not in conformity with Florida law and was therefore illegal. Thus the court concluded that venue did not lie in Indiana under either Section 128 or 129 of the Bankruptcy Act (note 1, supra). However, noting that a transfer of R.E.I.T.'s reorganization petition to the Southern District of Florida would entail dual administration, additional expense, and further delays, the court held that R.E.I.T.'s reorganization petition, as filed by the de facto trustees, should continue in the Southern District of Indiana. Accordingly, the motions to dismiss R.E.I.T.'s petition were denied.
 
 
 11
 The Securities and Exchange Commission participated in the hearing below and urged that R.E.I.T.'s petition be retained by the District Court. In this Court, the Commission filed a brief and participated in the oral argument, urging affirmance.
 
 
 12
 
 The de facto Trustees Had the Power to File R.E.I.T.'s Reorganization Petition
 
 
 
 13
 Appellants contend that Messrs. Beck, Welsh and Shumaker were not de facto trustees and that in any event they were not empowered to file R.E.I.T.'s reorganization petition. We disagree.
 
 
 14
 The parties concede that two elements are essential before these trustees can be deemed de facto trustees:
 
 
 15
 1. The office or position must be assumed under color of right or title.
 
 
 16
 2. Those claiming de facto status must exercise the duties of the office.[2]
 
 
 17
 Appellants' reply brief seems to concede the existence of the second element. The first element was also present.
 
 
 18
 Color of right or title merely means "authority derived from an election or appointment, however irregular or informal, so that the incumbent be not a mere volunteer." 2 Fletcher, Cyclopedia Corporations (rev. ed. 1954), Section 374 at p. 203. The Florida and Indiana cases are in accord with the general rule expressed in Fletcher. See Augusta, Tallahassee & Gulf R. Co. v. Kittel, 52 F. 63, 71 (5th Cir. 1892); Blackwelder v. D'Ercole Enterprises, Inc., 148 So.2d 721 (Fla.App.1963); Schepp v. Evansville Television, Inc., 236 Ind. 472, 141 N.E.2d 437 (1957).[3]
 
 
 19
 On September 12, 1966, the three original R.E.I.T. trustees resigned seriatim. Beryl E. Cook first resigned as trustee and Donald J. Bolinger and Floyd F. Cook elected Matthew E. Welsh to fill Cook's vacancy. Thereupon, Bolinger resigned and Floyd Cook and Welsh elected William E. Shumaker to fill Bolinger's vacancy. Finally, Floyd Cook resigned and Welsh and Shumaker elected Sigmund J. Beck to fill his vacancy. This procedure was prompted by Section 5.4 of the declaration of trust, which provides:
 
 
 20
 "Vacancies. The resignation, removal, incompetency, or death of any or all of the Trustees shall not terminate the Trust or affect its continuance. During a vacancy, the remaining Trustee or Trustees may exercise the powers of the Trust hereunder. The determination of a vacancy among the Trustees by reason of resignation, death, removal, or incompetency, when made by a majority of the remaining Trustees, and stated in the instrument filling such vacancy shall be final and conclusive for all purposes."
 
 
 21
 The minutes of the September 12, 1966, special meeting of the trustees show the original trustees' written approval of their resignations and show the successor trustees' written acceptance of the resignations and their own elections.[4] Hence the successor trustees were not usurpers but assumed office in a manner thought to be correct by them and their predecessors. Even appellant Hundley's proxy solicitation letter seemed to acknowledge the de facto status of what he termed the "newly appointed" successor trustees. He was of course attempting to obtain enough proxies to oust them, not the original trustees. His letter admitted that the successor trustees had R.E.I.T.'s records. His motion to dismiss described the successors as the "acting Trustees."
 
 
 22
 After their "elections," the successor trustees proceeded to discharge the duties of their offices. They were able to forestall foreclosure action on the Medical Towers Building in Fort Lauderdale by promising to pay a mechanic's lien in 30 days or to file a reorganization petition, thus indicating creditors' reliance on their assurances. They endeavored to obtain new financing for the trust and conducted investigations into the financial and management status of its properties. They held various discussions with R.E.I.T. mortgage-holders. They made an interest payment on the Colony Shopping Center which was owned partly by R.E.I.T. During their tenure, they strove to preserve the trust assets. Some one had to manage the trust after the September 12, 1966, resignation of the original trustees, and the three successor trustees filled this vacuum until the reorganization petition was filed and approved.
 
 
 23
 Since the color and exercise of right tests were thus both satisfied, the good faith action[5] of the de facto trustees in filing the reorganization petition was binding on third persons and R.E. I.T.'s stockholders.[6] As stated in 2 Fletcher, Cyclopedia Corporations (rev. ed. 1954), Section 386, pp. 221-222, "The general rule is that * * * the corporation may rely on the acts of its de facto officers against the opposition of stockholders."
 
 
 24
 In Aninos v. Maguire, 127 F.2d 817 (6th Cir. 1942), the court recognized the power of a de facto officer to vote to file a bankruptcy petition. There the corporation had three directors. One of the three was arguably insane, one was a de jure director, and the third was a de facto director. In refusing to set aside the bankruptcy adjudication, the Court of Appeals held that the petition for voluntary bankruptcy had been authorized by a majority of the board of directors, namely, the de jure and de facto directors, so that any incompetence of the third director was immaterial.
 
 
 25
 Although the Aninos case involved a corporation rather than a business trust, the cases and treatises recognize the frequent propriety of applying corporate law analogies to business trusts. See, e. g., Bomeisler v. M. Jacobson & Sons Trust, 118 F.2d 261, 265 (1st Cir. 1941); Bogert, Trusts and Trustees (2d ed. 1953), Section 310; 1 Scott on Trusts (2d ed. 1956), Section 2.2. In fact, Gray v. Union Trust Co., 213 Ind. 675, 691, 12 N.E.2d 931 (1938), acknowledged the authority of a de facto trustee even where a non-business trust was involved. Similarly, the Florida legislature has applied corporate concepts to business trusts and indeed regulates them in a chapter immediately following that on corporations. Florida Statutes Annotated, Chapters 608 and 609.
 
 
 26
 Since the successor trustees were de facto trustees and were never validly replaced by other trustees, we hold that they had the power to file R.E.I.T.'s reorganization petition.
 
 
 27
 
 The District Court Was Authorized to Retain R.E.I.T.'s Reorganization Petition
 
 
 
 28
 The District Court found that there was no proper venue in the Southern District of Indiana because R.E.I.T. had its principal place of business and its principal assets in Florida and because R.E. I.T. was not a subsidiary of Bankers Trust.[7] However, the court held that Section 32(b) of the Bankruptcy Act empowered it to retain or transfer the case but did not permit its dismissal. That Section provides (11 U.S.C. § 55 (b)):
 
 
 29
 "(b) Where venue in any case filed under this title is laid in the wrong court of bankruptcy, the judge may, in the interest of justice, upon timely and sufficient objection to venue being made, transfer the case to any other court of bankruptcy in which it could have been brought."
 
 
 30
 Appellants insist that the statutory phrase "the judge may * * * transfer the case" means that he must transfer or dismiss it. Such a construction does violence to the permissive language and is in opposition to the legislative history, case law, and scholarly opinion.
 
 
 31
 House Report No. 2320 on S. 2234, 82d Cong., 2d Sess. p. 7 (1952), explains the Congressional purpose in enacting Section 32(b):
 
 
 32
 "The first subdivision [Section 32(b)] proposed to be added incorporates the substance of the general statute on venue of District Courts stated in title 28, Section 1406, United States Code, modified only to accommodate it to the Bankruptcy Act. Under this first subdivision, the Judge may upon timely and sufficient objection transfer a case brought in the wrong court of bankruptcy. This subdivision also incorporates the first amendment to Section 1406 which changes `shall' to `may, in the interest of justice'. Ordinarily, no doubt the venue rules in bankruptcy will serve the interest of justice, but in the event that in the special case they do not, the judge will have discretion to retain the proceeding." (Emphasis added.)
 
 
 33
 In a careful opinion in In re Fada Radio & Electric Co., 132 F.Supp. 89 (S.D.N.Y.1955), Judge Dimock interpreted Section 32(b) as permitting the retention of a case in the wrong district or permitting a transfer when the interest of justice so requires.[8] Dismissal was not to be countenanced. There the principal place of business of the debtor was in New Jersey and no convincing reasons were given for retaining the proceeding in New York, so that it was transferred to the District of New Jersey.
 
 
 34
 In the later case of In re Hudik-Ross Co., 198 F.Supp. 695 (S.D.N.Y.1961), affirmed, 297 F.2d 32 (2d Cir. 1961), the court followed the Fada Radio interpretation of Section 32(b), but because the relationship of the New York and New Jersey corporate debtors was intertwined, both their petitions for arrangement were retained in the Southern District of New York.
 
 
 35
 In another pair of cases, the Eighth and Tenth Circuits have held that under Section 32(b), a district judge may not dismiss a bankruptcy case for want of venue[9] but has the choice of transferring it to the proper district or retaining it. In re Eatherton, 271 F.2d 199 (8th Cir. 1959); In re Martinez, 241 F.2d 345 (10th Cir. 1957). Since the district judge has no power to dismiss the proceeding, the use of the phrase "may * * * transfer" in Section 32(b) was construed to mean that he may transfer if he does not retain. In those cases, dismissal orders were reversed and the cases were remanded for the district courts to consider whether to retain or transfer the proceedings.
 
 
 36
 The role of the bankruptcy court under Section 32(b) was described as follows in 6 Collier on Bankruptcy (14th ed.), pp. 814-815:
 
 
 37
 "As a matter of fact, it has been pointed out in a bankruptcy case [In re Eatherton, supra] that in a situation of improper venue, the judge has only two alternatives if timely objection is made, neither of which is dismissal. He may transfer the case to the proper district or he may retain the case. This interpretation is in harmony with the language of § 32b, applicable to Chapter X proceedings, and with Congressional intent expressed in the revision of § 32. A dismissal because of improper venue would certainly seem improper in light of the comprehensive transfer provisions contained in § 32." (Footnotes omitted.)
 
 
 38
 To the same effect, see Seligson and King, "Jurisdiction and Venue in Bankruptcy," 36 Ref.J. 36, 37 (1962), and 6 Duke B.J. 137 (1957). 1 Remington on Bankruptcy (4th ed.), Sec. 51.5 (1968 Supp.) appears to be in accord.
 
 
 39
 The District Court here found the petition to have been filed in good faith in Indiana. Absent some showing of bad faith or oppression, we are inclined to agree with the above authorities that the harsh remedy of dismissal is not justified and that retention is authorized in the discretion of the District Court, depending only on the interest of justice.
 
 
 40
 
 In Retaining This Proceeding, The District Court Did Not Abuse Its Discretion
 
 
 
 41
 As seen, the District Judge was not empowered to grant appellants' motions to dismiss. However, treating these motions as motions to transfer the case to the Southern District of Florida, the next question is whether he was bound to transfer it. The exercise of discretion in such matters is not reviewable in the absence of abuse. Clark Bros Co. v. Portex Oil Co., 113 F.2d 45, 48 (9th Cir. 1940). Even though it has been said that discretion to retain jurisdiction "should be exercised with great caution and in few cases",[10] there were sufficient reasons to support retention here.
 
 
 42
 Some of the factors to be considered in deciding whether to retain or transfer have been noted as follows:
 
 
 43
 1. Proximity of creditors of every kind.
 
 
 44
 2. Proximity of the debtors to the court.
 
 
 45
 3. Proximity to the court of the witnesses necessary to the administration of the estate.
 
 
 46
 4. Location of the assets.
 
 
 47
 5. The economical and efficient administration of the estate.
 
 6. Intertwined relationships of debtors.[11]
 
 48
 With respect to the first factor, the claims of the secured creditors in Florida totaled $900,000, while the claims of the affiliated Indiana creditors totaled $765,000. Considering the residences of the various creditors, neither forum had a decisive advantage as to proximity of creditors.
 
 
 49
 As to the proximity of the debtors, the original and successor trustees are all Indiana residents, and after April 1964, R.E.I.T. carried on its day-to-day business affairs from Indiana. Its records are largely there even though its principal place of business remains in Florida.
 
 
 50
 Substantially all of the witnesses necessary to the administration of the estate reside in Indiana.
 
 
 51
 The major assets of the debtor are located in Florida.
 
 
 52
 The efficient and economical administration of the estate was found to require retention, since dual administration would be necessary if there were a transfer to the Southern District of Florida, resulting in increased costs and expenses of administration.[12] As the District Court stated, "The transfer of these reorganization proceedings to the state of Florida would entail dual administration, a great amount of additional administrative expense, problems arising from the commingling of the assets and the commingling of the debts of the various entities with which we are here concerned * * * as well as delay in the proceedings to permit a new trustee and new counsel to become acquainted with the affairs of R.E.I.T. of Florida, and substantial difficulty in the adjudication of claims."
 
 
 53
 The financial affairs of R.E.I.T. were clearly intertwined with those of the other entities below. Two major properties of R.E.I.T. were owned jointly by it and two Indiana trusts under the District Court's administration. Bankers Trust and its operating subsidiaries are all involved in the reorganizations pending in the court below. These subsidiaries have been running R.E.I.T.'s daily affairs.
 
 
 54
 The only factor conclusively supporting transfer to the Southern District of Florida is the location of R.E.I.T.'s assets, but this factor was greatly outweighed by the other five. Since the Indiana de facto trustees were able to protect R.E.I.T.'s Florida assets during their tenure, the District Court for the Southern District of Indiana and the Indianapolis trustee in reorganization should likewise be able to do so. Furthermore, the reorganization of the seven other interrelated debtors has been continuing in the Southern District of Indiana since October 1966 and should not be delayed by the transfer of this proceeding.
 
 
 55
 The commingling of funds and debts among all the other debtors involved in the consolidated proceeding before the District Court would alone support its exercise of discretion in favor of retention. A transfer to the Southern District of Florida would not only complicate this litigation but would necessitate undue duplication of effort among two district courts, possibly resulting in conflicts among them. Our review of the evidence satisfies us that neither the "interest of justice" nor the "interest of the parties"[13] compelled a transfer of this case. Rather its retention in the Southern District of Indiana was fully warranted.
 
 
 56
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 See Sections 128 and 129 of the Bankruptcy Act permitting petitions to be filed where the debtor corporation has its principal place of business or principal assets or where its parent's petition is filed (11 U.S.C. §§ 528 and 529)
 
 
 [2]
 See 2 Fletcher, Cyclopedia Corporations (rev. ed. 1954), Section 373
 
 
 [3]
 Griley v. Marion Mortgage Co., 132 Fla. 299, 182 So. 297 (Fla.1937), is not to the contrary. Even though the Florida Supreme Court stated that an attempt to name a successor trustee was "without authority and void," there was no holding that the successor trustee was not ade facto trustee. That question was not before the court.
 
 
 [4]
 Section 5.5 of the trust provides that "Title to the property of the Trust shall vest in successor Trustees upon written acceptance of their election or appointment * * *."
 
 
 [5]
 The appellants do not challenge the District Court's conclusion that the debtor's petition was filed in good faith by the successor trustees
 
 
 [6]
 Appellants place considerable reliance on a group of cases cited for the proposition that shareholders are not bound by the acts ofde facto officers. However, the cited cases hold only that shareholders who have not acquiesced in the de facto status of the directors or officers may not always be barred by the de facto doctrine from attacking their authority in disputes wholly internal to the corporation. See Independence Lead Mines Co. v. Kingsbury, 175 F.2d 983, 986 (9th Cir. 1949). Thus disputes over voting rights and stock ownership of the purported officers and directors (Mortgage Land Inv. Co. v. McMains, 172 Minn. 110, 215 N.W. 192 (1927)), authority to sell complaining shareholders' stock for nonpayment of assessments (Moses v. Tompkins, 84 Ala. 613, 4 So. 763 (1888)) and violation of fiduciary duty to the corporation (Stratton-Massachusetts Gold Mines Co. v. Davis, 222 Mass. 549, 111 N.E. 375 (1916)) need not be settled by an unthinking invocation of the de facto doctrine. Nothing in these cases suggests that this exception to the general rule that the acts of de facto officers bind the corporation would have any application to a reorganization proceeding affecting the rights of creditors.
 
 
 [7]
 The pertinent venue requirements (note 1, supra) appear in Sections 128 and 129 of the Bankruptcy Act (11 U.S.C. §§ 528 and 529). It is now well settled that these are venue and not jurisdictional provisions. See 1 Moore's Federal Practice (2d ed. 1964), p. 1654, and authorities cited
 
 
 [8]
 TheFada Radio case is cited with approval in 1 Moore's Federal Practice (2d ed. 1964), p. 1661.
 
 
 [9]
 Appellants' reply brief admits that Section 32(b) "does reflect a policy of discouraging dismissals" (at p. 8)
 
 
 [10]
 In re S. O. S. Sheet Metal Co., 297 F.2d 32 (2d Cir. 1961), affirming In re Hudik-Ross Co., 198 F.Supp. 695 (S.D. N.Y.1961). In contrast to this admonition in theS. O. S. Sheet Metal case, it was ponted out in In re Miller, 172 F. Supp. 208, 209-210 (D.Kan.1959), that a bankruptcy proceeding should not lightly be shifted to another court, and that the party seeking the transfer has the burden of showing that the interest of justice would be better served by transfer.
 
 
 [11]
 See, In re Hudik-Ross Co., 198 F.Supp. 695, 699, 700-701 (S.D.N.Y.1961), affirmed, 297 F.2d 32 (2d Cir. 1961)
 
 
 [12]
 In re Reliant Gages, Inc., 286 F.Supp. 110 (S.D.N.Y.1968), illustrates complications caused by dual administration
 
 
 [13]
 The quoted phrases are the tests established for transfer found in Section 32(b) and Section 32(c) of the Bankruptcy Act (11 U.S.C. §§ 55(b) and 55(c)). The latter Section permits transfer to any other district when in the best interest of the parties