IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| NOT ENOUGH TREES, LLC, a Washington Limited Liability Company, | ) ) ) | No. 39092-6-III |
| Appellant, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| WALTER D. DAVIS and JUDITH K. DAVIS, husband and wife and the marital community composed thereof, | ) ) ) ) | |
| Respondents. | ) ) | |

FEARING, C.J. — This appeal concerns the destruction of four plum trees. We must decide whether the president of a condominium association possessed, within the meaning RCW 64.12.030, the timber trespass statute, the lawful authority to remove trees on the outside of the condominium building without the consent of an association member. Because the condominium covenants and bylaws indisputably granted the president that authority, we affirm the superior court's grant of summary judgment in favor of the president.

FACTS

This lawsuit involves concerns the affairs of a condominium association formed to manage Spokane's historic Commission Building, built in 1906. The plaintiff is Not

No. 39092-6-III,
*Not Enough Trees, LLC v. Davis*

Enough Trees, LLC (NET), a limited liability company owned by Paul and Jennifer Mitchell. The defendants are Walter Dean Davis (Dean) and his wife. Davis serves as the president of the Commission Building Unit Owners' Association (CBUOA or association). We refer to Dean Davis as if he is the sole defendant. We garner the facts from affidavits filed in support of and in opposition to cross motions for summary judgment. The facts include extensive language from the covenants and bylaws of the association.

In 1986, Marlund Simchuk, the owner of the Commission Building, transformed the two-story downtown Spokane produce warehouse into a condominium for business offices. The condominium building contains twenty-four commercial units, twelve on each floor. Simchuk then recorded with the county auditor the governing Declaration, and Covenants, Conditions, Restrictions, and Reservations for the Commission Building Condominium (covenants). The language of the covenants controls in part the question of whether the condominium president held authority to remove landscaping.

The Commission Building covenants established the CBUOA consisting of all unit owners in the condominium. The ownership of each of the twenty-four units is entitled to one vote for condominium business. One vote represents a voting interest of 4.1666 percent.

Section 7 of the Commission Building covenants governs administration of the association and designates a Board of Trustees (board). Section 7.01.4 reads:

7.01.4 <u>Board</u>. The affairs of the Association shall be managed by a Board and by such officers as the Association or Board may designate.

Clerk's Papers (CP) at 436. This covenant does not require any delegation of duties to the president from the association to be in writing. Section 7 further declares:

7.01.6 <u>Powers and Duties.</u> The duties and powers of the Association shall be as set forth in this Declaration and the Bylaws, together with those reasonably implied to effect [sic] the purposes of the Association and this Declaration. The powers and duties of the Association shall be exercised in the manner provided for by this Declaration and the Bylaws and any duties or rights of the Association which are granted by or are to be exercised in accordance with the provisions of this Declaration shall be so exercised, except that, wherever this Declaration requires the act or approval of the Board, such act or approval must be done or given in accordance with the Bylaws.

CP at 438.

Paragraph 8.01.03 authorizes the condominium board:

[to] acquire and pay for the following out of the common expense fund as hereinafter provided:
(A) The improvement, lighting, maintenance and repair of walks, gateways, fences, ornamental features, building exteriors and other common areas and facilities now existing or hereafter to be constructed or created. . . .
. . . .
(F) Painting, maintenance, repair and replacement and all landscaping of the common areas and such furnishings and equipment for the common areas as the Board shall determine are necessary and proper.

CP at 438.

Section 4 of the Commission Building covenants defines the building's common areas as:

4.01.02  Structural Elements.  The foundations, studding, joists, beams, supports, walls (excluding only non-bearing interior partitions of the units), roofs, chimneys and fireplace walls, if any, and all other structural parts of the building to the unfinished interior surfaces of the units' perimeter walls, floors, ceilings, fireplaces, if any, windows and doors (that is, to the boundaries of the units under the Act).
. . . .
4.01.04  Access Features.  The corridors, lobbies and halls outside the units, stairways, and the entrances and exits of the building.
4.01.05  Landscaped Areas.  The yards, gardens, and landscaped areas which surround the building, and *any planters build into or adjacent to the building*.
4.01.06  Walkways and Driveways.  The driveways and walkways providing access to the building and the parking areas
. . . .
4.01.08  All Other Parts of the Property Necessary or Convenient to the condominium's existence, maintenance, and safety, or normally in common use.

CP at 433 (emphasis added).

The CBUOA covenants also delegate authority to the condominium association as a whole, as opposed to the board, to maintain, repair, and replace common areas.  Section 12.06 declares in part:

The Association, at its expense, shall be responsible for the maintenance, repair and replacement of . . .  [a]ll common areas.

CP at 445.

Marland Simchuk attached to the covenants and filed as one continuous document with the covenants pages entitled "Bylaws of Commission Building Unit Owners' Association" (bylaws).  The covenants identify the bylaws as exhibit D, and the label exhibit D appears on the bylaws.  Section 7.01.5 of the covenants references the bylaws:

4

7. 01.5 Bylaws.  The Bylaws of the Association shall be in the form of Exhibit "D" attached hereto and by this reference incorporated herein, and the unit owners hereby covenant to adopt these Bylaws at the first meeting of the Association.

CP at 437.  Simchuk never signed the bylaws.  No record exists to confirm whether the unit owners adopted the bylaws at its first meeting as required by the covenants.

We recite relevant sections of Commission Building condominium bylaws.

Article III addresses the authority and duties of trustees.

Section 2.  Powers of Trustees.
Subject to the powers of the members as provided by law or as herein set forth, all powers of the Association shall be exercised by or under the authority of, and the business and affairs of the Association shall be controlled by, the Board of Trustees.  Without limiting the generality of the foregoing, the Board of Trustees shall have the following powers:
(a) To appoint and remove all officers, agents, and employees of the Association, prescribe such powers and duties for them as may not be inconsistent with the law, the Declaration or the Bylaws. . . .
(b) To conduct and manage the affairs and business of the Association. . . .
. . . .
(e) To have and exercise all of the power and authority granted to the Board of Trustees under the Declaration and these Bylaws

CP at 476-77.  Section 12 appointed Marlund Simchuk as the sole trustee until a transition date.

Article IV of the bylaws addressed officers of CBUOA.

Section 1.  Officers.
The officers of this Association shall be a president, vice-president, and secretary/treasurer, and such other officer as the Board of Trustees may appoint. . . .
. . . .

5

> Section 5. President.
> Subject to the control of the Board of Trustees, the president shall have general supervision, direction and control of the business and affairs of the Association.

CP at 480.

According to CBUOA member Bradley Bergler, the association has never elected a board. The president of the association has assumed the responsibility for management and maintenance of the property and landscaping.

We return to some history behind the Commission Building and the condominium association. From 1995 to 2017, Steve Clark owned units 111 and 112 of the condominium building. Before purchasing the units, Clark observed that the loading dock near the units had fallen into disrepair, and he believed that planting trees in its vicinity would enhance the aesthetic appeal of the loading dock area and the condominium as a whole. The trees would take years to grow to sufficient size to contribute to the aesthetics. So, Clark endeavored to condition his purchase of units 111 and 112 on obtaining an addendum to the association covenants. The Clark Addendum reads:

> The terms of the sale of Units #111 and #112 of the Commission Building Condominium, West 216 Pacific Avenue, Spokane, WA., by Robert W. and Kathleen L. Hess to Stephen R. and Sharon K. Clark, require written acknowledgement and approval by the [CBUOA] of the following contingencies:
> Within thirty days of acceptance of this offer by Seller, Seller is to secure written acknowledgement and approval by Condominium Association of delegation to Purchaser and Purchaser's successors of the

6

right to use and control access to the easterly 72 feet of the existing loading dock north of Unit #112 for purposes of his business entry and to perform the following items:

a. Maintenance, improvement and/or replacement of existing windows and entry doors within confines of three existing arched brick openings at the north exterior wall of Unit #112.

b. Maintenance, improvement and/or replacement of existing security fence and gate.

c. Maintenance, improvement and/or replacement of existing lightweight steel trellis/roof structure on the north lower face of structure.

d. Installation of approved trees and other landscape materials in concrete or other approved planters.

e. Installation of additional steel and concrete stairs and handrail to match existing and concrete pad at existing planter in northeast corner of parking area to access loading dock, or alternate access to loading dock as mutually agreed upon.

f. Removal of broken concrete remains and repair at lower northwest corner of structure.

g. Repair of broken/damaged south concrete edge of loading dock adjacent to stairs in item "e" above.

h. Chemical or other approved method of cleaning brick face of lower portion or entire north wall of structure.

i. Installation of additional trees and other landscape material in existing planters adjacent to Units #111 and #112 and stairs in item "e" above.

j. Installation of business sign(s) as designated by purchaser adjacent to stairs in item "e" above.

It is understood that none of the above is intended to alter, extend or restrict provisions within the existing Condominium [covenants] pertaining to use and access of Common Areas and Limited Common Areas described in Sections 4 and 5, as applied to said portions of north loading dock. Any of the improvements listed above will be done at Purchaser's expense unless otherwise assumed by the Condominium Association. Planting and other improvements made by Purchaser will be maintained in good condition by Purchaser, unless otherwise assumed by Condominium Association. All design, character, material, and color of improvements shall be subject to reasonable approval of Condominium Association.

As a further contingency within thirty days of acceptance of this offer, Seller shall secure written approval by Condominium Association for

> Purchaser to install at his cost one additional matching entry each to the west wall of Units #111 and #112, including potential extension of matching existing walkway as required to access Unit #112.
>
> The above listed contingencies are hereby acknowledged and approved by the following signors on behalf of the [CBUOA] as legally provided under the [covenants] of the Condominium.

CP at 485-86.

The record contains two copies of the Clark Addendum. One copy includes signature lines for the president and other members of the association. In November 1994, then president Rick Hosmer signed this copy. No other members signed the copy. A second copy of the addendum contains only a signature line for the association president. In February 1995, Hosmer signed this copy. No one recorded either copy of the addendum.

According to CBUOA member Dale Shafer, Shafer and other members of the association elected not to sign the Clark Addendum because they did not wish to surrender rights under the covenants. The purchase and sale agreement to Steve Clark and the deed to Clark for units 111 and 112 did not reference the Clark Addendum.

After purchasing units 111 and 112, Steve Clark planted plum trees. Before planting the trees, Clark employed a contractor to cut and remove five sections of concrete on the loading dock. Heavy equipment filled five planters and the underlying portions of the loading dock with soil. Clark planted one plum tree in each planter. Clark paid for the cost of the installation of the trees.

In 2004, Dean Davis purchased units 101-103 in the condominium. In 2016 he purchased unit 104. Davis operates a commercial photography business in units 101-103. Davis has served as president of the CBUOA since 2007. President Davis administers the association informally. As president of the association, Davis has overseen grounds maintenance, security, and landscaping for the Commission Building. Davis lacked any knowledge of the Clark Addendum.

In 2012, Brad Bergler, Steve Clark's upstairs neighbor, complained about the maintenance of Clark's plum trees. The trees shed fruit, four of the trees had grown into the overhanging trellis, and the trees blocked Bergler's view from his windows. Clark took little, to no, steps to alleviate Bergler's murmuring. In 2014, Bergler e-mailed members of the CBUOA, including Clark, requesting that the trees be pruned or thinned. Clark still took no steps.

In 2017, Brad Bergler complained to CBUOA President Dean Davis about Steve Clark's plum trees. Davis consulted arborist Kelly Chadwick about pruning the plum trees. Chadwick noticed that four trees had grown through the trellis attached to the building and that the trees had outgrown their respective planting pots. Chadwick commented that the trees might die from the overgrowth. Pruning the plum trees would not solve the problem of the trees outgrowing the planters. Chadwick recommended removal of the trees.

Brad Bergler unsurprisingly agreed to removal of the plum trees.  Bergler owns an interest in seven of the twenty-four units.

Jerry Thew owns three or four units of the Commission Building.  He concurs that the members conducted business informally through the presidency of Dean Davis.  Davis kept the membership informed.  Thew gave Davis permission for removal of the plum trees.  Thew agreed the trees caused a problem.

Darin Klundt owns an interest in four of the Commission Building units.  Klundt confirms that President Dean Davis cared for maintenance of the grounds, landscaping, parking lot, and outside lighting.  The plum trees created a problem, and Steve Clark failed to maintain them.  Davis informed Klundt of the prospective removal of the trees.  Klundt raised no objection.

Dean Davis contacted Jill Weaver, also a unit owner and member in CBUOA.  Weaver owns three units.  According to Weaver, President Davis performed common area maintenance and maintains landscaping.  Weaver wondered if the trees could be trimmed.  Nevertheless, Weaver gave approval for removal.

Over the objection of his attorney, Paul Mitchell, owner of NET, testified that the president of the association possesses authority to perform landscaping.

On November 29, 2017, Steve Clark sold condominium units 111 and 112 to NET.  Paul and Jennifer Mitchell's love of trees made the plum trees a significant factor in

10

NET's decision to purchase Clark's units. Despite the sale in November 2017, Clark occupied the units under a rental agreement until February 2, 2018.

Dean Davis, on behalf of CBUOA, hired Allan Etherton to remove four of the five plum trees. Etherton and his crew removed the trees, during a three-and-one-half hour project, on either February 3 or 4, 2018. Etherton observed that the four trees had grown into the trellis. The Mitchells discovered the absence of the trees on February 5. Thereafter someone on behalf of the Mitchells planted flowers in the planters.

PROCEDURE

NET sued Dean Davis for damages under RCW 64.12.030, Washington's timber trespass statute, for the removal of the four plum trees. We do not know why NET did not sue the association.

NET filed a motion for partial summary judgment on the issue of Dean Davis' liability under the statute, and Davis filed a cross motion for summary judgment to dismiss the action. The superior court granted Davis' motion and correspondingly denied NET's motion.

LAW AND ANALYSIS

On appeal, NET contends that the superior court should have granted it summary judgment, but at the least the court should have denied Dean Davis' motion because of disputed material facts. The gist of the appeal is whether Davis possessed lawful

11

authority to remove the trees as required by RCW 64.12.030. This question depends more on condominium law than trespass law.

RCW 64.12.030 declares:

> Whenever any person shall cut down, girdle, or otherwise injure, or carry off any tree . . . *on the land of another person*, . . . *without lawful authority*, in an action by the person . . . against the person committing the trespasses or any of them, any judgment for the plaintiff shall be for treble the amount of damages claimed or assessed.

(Emphasis added.) RCW 64.12.030 evidences the importance of timber to Washington State. The Washington territorial legislature enacted the timber trespass statute in 1869 to punish an offender, provide treble damages, and discourage persons from carelessly or intentionally removing another's merchantable shrubs or trees on the gamble that the enterprise will be profitable if actual damages only are incurred. LAWS OF WASH. Terr. 1869, ch. XLVIII, § 556; *Guay v. Washington Natural Gas Co.*, 62 Wn.2d 473, 476, 383 P.2d 296 (1963). The text has remained the same except with the addition of the language "Christmas trees." LAWS OF 2009, ch. 349, § 4. We doubt that the legislature contemplated applying the trespass statute to trees in planters outside a commercial downtown building, but we still apply the statute.

The timber trespass statute is penal in its nature, not merely remedial. *Broughton Lumber Co. v. BNSF Railway Co.*, 174 Wn.2d 619, 633, 278 P.3d 173 (2012); *Grays Harbor County v. Bay City Lumber Co.*, 47 Wn.2d 879, 886, 289 P.2d 975 (1955); *Gardner v. Lovegren*, 27 Wash. 356, 362, 67 P. 615 (1902). As such, this court strictly

construes the statute. *Broughton Lumber Co. v. BNSF Railway Co.*, 174 Wln.2d 619, 633 (2012).

RCW 64.12.040, a companion statute to RCW 64.12.030, excuses the trespasser from treble damages if she or he possessed probable cause to believe he or she owned the land on which the trees grew. Dean Davis does not assert this statute, presumably because its application would still expose him to single damages. Davis, however, seeks to avoid liability under a theory that NET did not own the land on which the four plum trees sat. We do not rely on this theory. Under a Washington Supreme Court ruling, the defendant need not trespass on the plaintiff's property for RCW 64.12.030 to apply as long as the defendant trespasses against the tree. *Jongeward v. BNSF Railway Co.*, 174 Wn.2d 586, 606 (2012).

NET claims the benefit of the timber trespass statute on the theory that it was, at a minimum, part owner of the trees. NET emphasizes that tenants in common of a tree have rights under the statute. *Herring v. Pelayo*, 198 Wn. App. 828, 837, 397 P.3d 125 (2017). Under RCW 64.32.050(1) condominium owners hold an undivided interest in common areas.

RCW 64.12.030 may require not only ownership, but the right to possession of the trees to prevail. *Bloedel Timberlands Development, Inc. v. Timber Industries, Inc.*, 28 Wn. App. 669, 679, 626 P.2d 30 (1981). Dean Davis does not argue that NET lacked a right to possess the plum trees.

NET fleetingly contends that, under the Clark Addendum, NET possessed sole ownership of the plum trees and the sole right to maintain the trees. But NET fails to analyze whether the Clark Addendum bound the association or other unit owners when owners in 1994 objected to the addendum, no one recorded the addendum, and the addendum amended the covenants without approval of a majority of unit owners. NET also fails to analyze whether the association would still own the right to remove the trees, despite NET's sole ownership, when the trees created a nuisance and interfered in the enjoyment of other unit owners. Appellate courts need not consider arguments unsupported by pertinent authority or meaningful analysis. *Cook v. Brateng*, 158 Wn. App. 777, 794, 262 P.3d 1228 (2010), *rev'd on other grounds*, 180 Wn. App. 368 P.3d 1255 (2014).

Both parties focus on whether Dean Davis possessed "lawful authority" to remove the plum trees. We do also. By its own terms, RCW 64.12.030 only applies to persons acting "without lawful authority." *Mustoe v. Ma*, 193 Wn. App. 161, 170, 371 P.3d 544 (2016).

No case discusses whether one lacked "lawful" authority under the statute. We question whether the addition of the word "lawful" to the word "authority" adds any meaning to the statute. All authority should be lawful. We have never heard of anyone acting pursuant to "unlawful authority." We decline to promulgate an authoritative definition for "without lawful authority" for purposes of RCW 64.12.030. We merely

hold that under the circumstances of this appeal, even in a light most favorable to NET, Dean Davis possessed lawful authority to remove the four plum trees.

NET contends that, since one co-owner of a tree may be found liable to another co-owner for damage to the tree, only one with exclusive property ownership over the common area or the trees possesses "lawful authority." This reading goes too far. NET's position would impose liability on the government for destroying a tree infested with noxious insects or a disease for the purpose of preventing the insects or disease from spreading to neighboring property. NET's theory would also hold one liable for damage to a tree even if given permission from the tree's owner to sever the tree.

Next, NET employs the definition attached to the phrase "authority of law" for purposes of article I, section 7 of the Washington Constitution as it relates to search and seizure law. In *State v. Gunwall*, 106 Wn.2d 54, 68-69, 720 P.2d 808 (1986) held that "'authority of law' includes authority granted by a valid . . . statute, the common law or a rule of this court." Based on this passage, NET contends Dean Davis needed statutory or rulatory authority to remove the plum trees. We question whether we should utilize the search and seizure definition for the phrase in the context of the timber trespass statute. Nevertheless, because the Supreme Court included the word "includes" in the passage, "authority of law" could encompass more than a statute, the common law, or a court rule. We also suspect that authority under the common law could include authority by contract, a license, or other form of permission. Washington case law reads that "lawful authority"

15

in the context of RCW 64.12.030 can mean that the rightful owner of the trees "acquiesced in and consented to the cutting and removal of the timber." *Lytle Logging & Mercantile Co. v. Humptulips Driving Co.*, 60 Wash. 559, 561, 111 P. 774 (1910).

We look to Washington condominium statutes, the Commission Building covenants and bylaws, and practices of CBUOA to probe whether Dean Davis possessed lawful authority to remove trees from common areas. NET concedes the plum trees sat within common areas.

The Horizontal Property Regime Act (HPRA), Chapter RCW 64.32, governs condominiums established in Washington between 1963 and July 1, 1990. The HPRA permits a condominium association to adopt its own declaration and bylaws. *Lake v. Woodcreek Homeowners Association*, 169 Wn.2d 516, 521, 243 P.3d 1283 (2010). The HPRA permits a condominium to designate common areas, wherein unit owners own an undivided interest. *Lake v. Woodcreek Homeowners Association*, 169 Wn.2d 516, 521-22 (2010); *Rouse v. Glascam Builders, Inc.*, 101 Wn.2d 127, 131, 677 P.2d 125 (1984). Common areas include entrances and exits of the building, roofs, corridors, yards, gardens, and parking areas. RCW 64.32.010(6). The association's declarations may extend the extent of the common areas. RCW 64.32.010(6).

RCW 64.32.030 provides that each unit owner lacks the exclusive right to ownership and possession of common areas. Use of the common areas should not

encroach on the rights of other members. RCW 64.32.050(4). Under RCW 64.32.050(5),

> [t]he necessary work of maintenance, repair and replacement of the common areas and facilities and the making of any addition or improvement thereto shall be carried out only as provided in [the HRPA] and in the bylaws.

We emphasize some of the covenants and bylaws of the CBUOA, to which NET consented when purchasing units 111 and 112. Section 7.01.4 of the covenants authorizes management of the affairs of the association by designated officers like President Dean Davis. The same section provides for adoption of maintenance and other procedures to prevent unreasonable uses and interference with common areas. Section 8.01.3(A) provides for the use of common expense funds to pay for maintenance of ornamental features, exteriors, and common areas.

Section 12.06 of the covenants delegates maintenance of all common areas to the association. Section 12.07 of the covenants allows for maintenance of exterior appearance and structures including awnings. The CBUOA's covenants define "common areas" as including roofs, chimneys, corridors, entrances, exits, yards, gardens, landscaping, and walkways. CP at 433-34. The covenants particularly define common areas as "planters built into or adjacent to the building." CP at 433-34.

We do not deem the CBUOA bylaws necessary to our holding in favor of Dean Davis. Nevertheless, we deem them binding and supportive of Davis' right to remove the

17

trees. Although Marlund Simchuk, the creator of the condominium association, never signed the bylaws, he attached them to the signed covenants and recorded the bylaws as part of the covenants. The signed covenants incorporated the bylaws. The association never sought to alter the bylaws thereafter.

Article IV of the bylaws allows the board to delegate its authority to officers. The bylaws afforded the president the power of general supervision, direction, and control of the business and affairs of the association. The bylaws assumed that the president will serve on the board. Since no other board members were ever selected, Dean Davis could be considered the sole trustee.

The undisputed facts demonstrate that members of the CBUOA deemed Dean Davis to be president of the association at all times relevant with the authority to maintain common areas. NET does not identify any other body or person that functioned as the administrator of the association. NET does not identify any other functioning body or person in control of the common areas. In effect, Davis became de facto trustee and president with authority to govern the common areas at the Commission Building. The acts of a de facto officer hold the same validity as a duly elected officer. *In re Bankers Trust*, 403 F.2d 16, 20 (7th Cir. 1968); *Permagon Press, Inc. v. Ross*, 61 Misc. 2d 479, 306 N.Y.S.2d 103, 105-06 (N.Y. Sup. Ct. 1969).

NET fails to develop any argument that, because of the failure to ever elect a board, no one on behalf of the association could exercise the powers reserved to the board

under the covenants and bylaws. If no board was active and assuming Dean Davis lacked authority to govern the common areas, the power likely reverted to the members and the members could decide by majority vote whether to remove landscaping deemed detrimental to the association. The undisputed facts establish that Davis received approval from those holding at least twenty-one of the twenty-four units of voting power in the association. With few exceptions under the covenants, a vote of at least a majority of the voting power prevails.

This court reviews an order granting or denying summary judgment de novo and performs the same inquiry as the trial court. *Jones v. Allstate Insurance Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002); *Auto Sox USA Inc. v. Zurich North America*, 121 Wn. App. 422, 425, 88 P.3d 1008 (2004). The moving party has the initial burden of establishing the absence of an issue of material fact. *Cox v. Malcolm*, 60 Wn. App. 894, 897, 808 P.2d 758 (1991). This court views "all facts and reasonable inferences therefrom most favorably toward the nonmoving party," and "will grant the motion only if reasonable people could reach but one conclusion." *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000); *Coggle v. Snow*, 56 Wn. App. 499, 509, 784 P.2d 554 (1990). If the moving party establishes its motion is adequately supported, the nonmoving party must "set forth specific facts showing there is a genuine issue requiring trial." *Cox v. Malcolm*, 60 Wn. App. 894, 897 (1991). Summary judgment is appropriate "if the pleadings, affidavits, and depositions establish that there is no genuine issue as to

any material fact and the moving party is entitled to judgment as a matter of law."

*Lybbert v. Grant County*, 141 Wn.2d 29, 34 (2000).

The undisputed facts show that Dean Davis assumed the position of president or sole trustee of CBUOA, that the covenants and bylaws granted the board and the president authority to control common areas including planters, that the overwhelming majority of owners treated Davis as the governing authority for the common areas, and that the overwhelming majority of owners approved of the removal of the four plum trees. NET has failed to forward facts thwarting these factual conclusions.

CONCLUSION

We affirm the superior court's grant to Dean Davis of summary judgment dismissal of NET's claim under the timber trespass statute.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____          _____
Pennell, J.                                                    Staab, J.

20